UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOSE SANTIAGOCRUZ,

                            Plaintiff,

v.                                      9:21-CV-0806
                                      (TJM/ML)
JOHN DOE #4, Officer, Great Meadow Corr.
Facility; JOHN DOE #5, Officer, Great Meadow
Corr. Facility; LEON GORDON; PATRICK
BECK; and BRANDON DAIGLE,

                            Defendants.

_____

APPEARANCES:                            OF COUNSEL:

JOSE SANTIAGOCRUZ
  *Pro Se* Plaintiff
Woodbourne Correctional Facility
99 Prison Road
Post Office Box 1000
Woodbourne, New York 12788

LETITIA A. JAMES                       BRITTANY HANER, ESQ.
Attorney General                        Assistant Attorney General
  Counsel for Defendants Gordon, Beck, and Daigle
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

     Currently before the Court, in this civil rights action filed by Jose Santiagocruz

("Plaintiff") against defendants John Doe #4, John Doe #5, Leon Gordon, Patrick Beck, and

Brandon Daigle (collectively "Defendants") who are—or were at the relevant time—employed at

Great Meadow Correctional Facility ("Great Meadow"), is Defendants Gordon, Beck, and

Daigle's (collectively "Named Defendants") motion for summary judgment. (Dkt. No. 48.) For the reasons set forth below, I recommend that Named Defendants' motion for summary judgment be granted. (*Id*.)

## I.   RELEVANT BACKGROUND

### A.   Plaintiff's Claims

At this procedural posture, Plaintiff asserts failure to protect claims in violation of the Eighth Amendment and 42 U.S.C. § 1983 against Defendants.[1] (Dkt. Nos. 20, 21.)

### B.   Named Defendants' Statement of Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Named Defendants in their Statement of Material Facts and not denied by Plaintiff in a response. (*Compare* Dkt. No. 48, Attach. 1 [Named Defs.' Statement of Material Facts], *with* Dkt. No. 58 [Pl.'s Resp.].)

---

[1]      Plaintiff filed his complaint on or about July 15, 2021. (Dkt. No. 1.) In the more than two years that have passed since then, Plaintiff has not identified Defendants John Doe #4 and John Doe #5, and has not served process upon them. (*See generally* docket sheet.) This failure is not the result of lack of opportunity. The undersigned has extended the discovery deadline. (Dkt. Nos. 39.) Plaintiff has had more than two years—far more than the typical 120-day period—to identify and serve Defendants John Doe #4 and John Doe #5, and the Court is under no obligation to extend the deadline indefinitely. *See Petway v. City of New York*, 02-CV-2715, 2005 WL 2137805, at *5 (E.D.N.Y. Sept. 2, 2005) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly three years of filing complaint); *Thomas v. Keane*, 99-CV-4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); *Cammick v. City of New York*, 96-CV- 4374, 1998 WL 796452, at *1 (S.D.N.Y. Nov. 17, 1998) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); *Waldo v. Goord*, 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (Kahn, J.) (dismissing a claim under Fed. R. Civ. P. Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint). The undersigned, therefore, recommends *sua sponte* dismissal without prejudice of the claims against Defendants John Doe #4 and John Doe #5 for lack of timely service.

1.      Plaintiff is an incarcerated individual in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

2.      At all times relevant to the incidents described in the Amended Complaint, Plaintiff was housed at Great Meadow.

3.      Plaintiff brings claims against Defendants for their alleged failure to protect Plaintiff from an attack.

<u>The Incident</u>

4.      On May 22, 2021, Plaintiff was attacked by another incarcerated individual while Plaintiff and others were walking out of their cells and onto a housing unit gallery on their way to Great Meadow's mess hall for dinner.

5.      Plaintiff lost consciousness and his sight at some point during the attack.

6.      Plaintiff estimated that the attack lasted for approximately ten minutes.

7.      Video surveillance of the incident demonstrates that the attack lasted approximately twenty-two seconds.

8.      Within six seconds of the start of the attack, officers can be heard shouting direct orders to incarcerated individuals in the area to "get on the wall."

9.      Plaintiff testified that there were five officers present when the attack began: two on each end of the company where the doors are located and one in the console box.

10.     Plaintiff testified that he ran toward two officers near the doors where the console box is located.

11.     Video surveillance demonstrates that there were only three officers present when the attack began—two at the far end of the company and one in the console box.

12.     The majority of the attack occurred in the area near the console box and doors to the stairwell nearby.

<u>Defendant Beck's Involvement</u>

13.     On May 22, 2021, Defendant Beck escorted a group of incarcerated individuals at Great Meadow, including Plaintiff, to the mess hall for dinner.

14.     The escort was part of Defendant Beck's usual job responsibilities.

15.     Defendant Beck was situated at the back of the group.

16.     The group spanned approximately 218 feet from the first person to the last.

17.     Defendant Beck heard a disturbance at the opposite end of the group and ordered the incarcerated individuals in the area to position themselves on the wall while he used a radio to report the disturbance.

18.     Such orders are required pursuant to DOCCS' protocols.

19.     Officers are trained to wait for additional responding officers before intervening in altercations between incarcerated individuals for security reasons.

20.     DOCCS' policies emphasize the need to wait for responding officers in closed spaces, such as a housing unit gallery with limited exits and an enclosed space with many incarcerated individuals.

21.     Plaintiff's attacker swung a red towel that contained an object and used it to strike Plaintiff in the head and face.

22.     Plaintiff's attacker complied with direct orders to stop and retreated quickly to the nearby stairwell.

<u>Defendant Daigle's Involvement</u>

23.     Defendant Daigle responded to a radio call for assistance in response to Plaintiff's attack.

24.     Defendant Daigle arrived after the attack and did not witness Plaintiff's attack.

25.     Defendant Daigle prepared a misbehavior report for the incident.

<u>Defendant Gordon's Involvement</u>

26.     On May 22, 2021, Defendant Gordon worked in the console box on the east side of the facility that covers both "A Block" and "B Block" and performed movement and control tasks on "B5 company."

27.     The console box is a sealed secure area that incarcerated individuals cannot access.

28.     While in the console box, Defendant Gordon was responsible for the opening and closing of cell gates in a secure housing unit.

29.     Defendant Gordon did not approach the altercation because he was locked inside the console box.

30.     DOCCS policies prohibit correction officers from immediately approaching physical altercations between incarcerated individuals.

31.     DOCCS policies also prohibit console officers from leaving the console box during altercations between incarcerated individuals.

32.     DOCCS policies require correction officers to order all nearby incarcerated individuals to place their hands high and flat on the walls when a fight breaks out.

33.     DOCCS policies require correction officers to radio for assistance when a fight breaks out.

<u>Exhaustion of Administrative Remedies</u>

34.     The DOCCS grievance process allows any incarcerated individual who is personally affected by an issue to submit their grievance complaint to the Incarcerated Individual Grievance Resolution Committee ("IIGRC"), a facility committee made up of elected incarcerated representatives and appointed staff members.

35.     The grievance process is also described in detail in DOCCS Directive #4040. N.Y.C.R.R. Title 7 and Directive #4040 are available in the Great Meadow law library.

36.     The incarcerated grievance process, which was established by 7 N.Y.C.R.R. § 701.5, involves three steps: (1) the incarcerated individual must file a complaint with the IIGRC within 21 calendar days of an alleged incident at the individual facility where the incarcerated individual is housed, even if the alleged incident occurred at another facility.  The IIGRC has 16 calendar days in which to attempt to informally resolve the complaint or hold a hearing; (2) if dissatisfied with the IIGRC recommendation, the incarcerated individual may appeal it to the Superintendent of the facility within 7 calendar days after receipt of the IIGRC's written response.  The request to appeal must be submitted, in writing, directly to the IIGRC at the facility where the grievance was filed.  The Superintendent has 20 calendar days to render a response; and (3) if dissatisfied with the Superintendent's response, the incarcerated individual may appeal the decision to the Central Office Review Committee ("CORC") within 7 calendar days after receipt of the Superintendent's written response.

37.     The request to appeal to CORC must also be submitted, in writing, directly to the IIGRC at the facility where the grievance was filed, for forwarding to CORC.

38.     CORC is the final appellate level of the IGP.

39.     DOCCS also provides an expedited procedure for the review of grievances alleging harassment or misconduct by DOCCS employees.

40.     A grievance that falls under this category will be directly forwarded to the Superintendent upon filing, who has 25 calendar days to render a response.

41.     While the expedited procedure allows for direct forwarding of such a grievance to the Superintendent of the facility, an incarcerated individual must still initiate the grievance process by filing a grievance in accordance with § 701.5.

42.     If an incarcerated individual disagrees with the Superintendent's response, they must still appeal the decision to CORC to exhaust their administrative remedies.

43.     Further, if an incarcerated individual fails to receive a response from the Superintendent to an expedited grievance within the specified time, the failure to respond may be construed as a denial, and the incarcerated individual must still appeal to CORC to exhaust their administrative remedies.

44.     Plaintiff did not file a grievance related to the incident of May 22, 2021, described in the Complaint.

45.     As of January 2023, CORC had not received any appeals from Plaintiff regarding the incident of May 22, 2021.

**C.      Parties' Briefing on Named Defendants' Motion for Summary Judgment**

**1.      Named Defendants' Motion for Summary Judgment**

Generally, in support of their motion for summary judgment, Named Defendants assert the following three arguments: (1) Plaintiff failed to exhaust available administrative remedies before commencing this action; (2) in the alternative, Plaintiff cannot establish an Eighth Amendment claim; and (3) in the alternative, Named Defendants are entitled to dismissal of

Plaintiff's claims based on the doctrine of qualified immunity.  (*See generally* Dkt. No. 48, Attach. 2.)

More specifically, first, Named Defendants assert that Plaintiff's claim is subject to administrative exhaustion pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA").  (Dkt. No. 48, Attach. 2 at 11-13.)  Named Defendants argue that Plaintiff failed to file a grievance related to Named Defendants' alleged failure to protect him on May 22, 2021, or thereafter.  (*Id*.)  In addition, Named Defendants argue that Plaintiff failed to appeal any grievance to CORC related to Named Defendants' alleged failure to protect on May 22, 2021. (*Id*.)

Second, in the alternative, Named Defendants assert that the video demonstrates that the attack lasted approximately twenty-two seconds, which permitted officers little time to detect and physically intervene.  (Dkt. No. 48, Attach. 2 at 13-17.)  Moreover, Named Defendants assert that the video demonstrates that within six seconds of the start of the attack, officers— including Defendant Beck—were shouting direct orders to incarcerated individuals in the area to position themselves against the walls, pursuant to DOCCS protocol.  (*Id*.)  Named Defendants argue that some incarcerated individuals did not hurriedly comply with orders to get on the wall and officers are trained to wait for compliance before approaching a physical altercation.  (*Id*.) Further, Named Defendants argue that, pursuant to DOCCS protocol, officers must radio for assistance and wait for additional officers to arrive before approaching a physical altercation, which is what occurred on May 22, 2021.  (*Id*.)  Named Defendants assert that no officer was able to safely, physically intervene during the twenty-two second attack but officers did intervene by giving direct orders and radioing for assistance.  (*Id*.)

Third, in the alternative, Named Defendants argue that no rational jury could conclude that they violated a statute or constitutional right based on the record evidence in this action. (Dkt. No. 48, Attach. 2 at 17.)  Named Defendants argue that thus, they are entitled to dismissal of Plaintiff's claims based on the doctrine of qualified immunity.  (*Id.*)

### 2. Plaintiff's Response in Opposition to Named Defendants' Motion for Summary Judgment

Generally, in opposition to Named Defendants' motion for summary judgment, Plaintiff argues that he filed a grievance related to Defendants' failure to protect him on May 22, 2021. (*See generally* Dkt. No. 58.)  Plaintiff's opposition appears to include a copy of a grievance dated May 31, 2021.  (Dkt. No. 58 at 2.)  In addition, Plaintiff's opposition includes a "Personal Statement" dated July 12, 2023, which states that Plaintiff knows how to file a grievance and how to "file forward."  (*Id*. at 3.)

### 3. Named Defendants' Reply in Further Support of their Motion for Summary Judgment

Generally, in further support of their motion for summary judgment, Named Defendants assert the following three arguments: (1) their statement of facts must be admitted because Plaintiff failed to respond to Named Defendants' properly supported statement of material facts not in dispute pursuant to Fed. R. Civ. P. 56; (2) Plaintiff's opposition failed to introduce a question of fact as to whether he failed to exhaust his administrative remedies because (a) there are serious doubts as to the authenticity of Plaintiff's purported grievance, and (b) Plaintiff does not dispute that he failed to exhaust his administrative remedies by appealing his grievance to CORC before commencing this action; and (3) the Court should grant Named Defendants' motion on their unopposed arguments related to the merits of Plaintiff's claims and based on the doctrine of qualified immunity.  (*See generally* Dkt. No. 61.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Standard Governing A Motion For Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-

---

[2]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

movant is proceeding *pro se*.[3]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[4]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[5]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1.  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported

---

[3]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[4]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[5]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[6]–even when the non-movant was proceeding *pro se*.[7]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[8] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[6]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[8]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B.    Standard Governing Exhaustion of Administrative Remedies**

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA] mandates that an [incarcerated individual] exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all [incarcerated individual] suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an incarcerated individual is confined and doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548 U.S. at 90)).  In New York State prisons, DOCCS has a well-established three-step incarcerated grievance program ("IGP"), in which, (1) the incarcerated individual must file a grievance with the Incarcerated Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the incarcerated individual must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the incarcerated individual must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response.  7

N.Y.C.R.R. § 701.5; *McGee v. McGready*, 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* 7 N.Y.C.R.R. § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. 7 N.Y.C.R.R. § 701.8. If the Superintendent fails to respond within twenty-five days, the incarcerated individual may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the incarcerated individual has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h).[9] Incarcerated individuals who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

"CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the [incarcerated individual] does not receive such confirmation within forty-five days, he 'should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.'" *Ruiz v. Link*, 20-CV-0235, 2022 WL 3020254, at *4 (S.D.N.Y.

---

[9]     The procedure to appeal to CORC under the normal, non-expedited procedures is the same. 7 N.Y.C.R.R. § 701.5(d)(1)(i).

July 29, 2022) (quoting 7 N.Y.C.R.R. § 701.5(d)(3)(i)).  The IGP requires CORC to respond to

an appeal within thirty days of receipt.  7 N.Y.C.R.R. § 701.5(d)(3)(ii).  If CORC has received an

appeal and fails to rule within those thirty days, the incarcerated individual is considered to have

exhausted his administrative remedies and may file suit.  *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d

Cir. 2020).

      While the PLRA mandates exhaustion of administrative remedies, it also "contains its

own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically,

section 1997e(a) provides that only those administrative remedies that "are available" must first

be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion

requirement hinges on the availability of administrative remedies[.]") (quotation marks and

citations omitted).  In the PLRA context, the Supreme Court has determined that "availability"

means that "an [incarcerated individual] is required to exhaust those, but only those, grievance

procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136

S. Ct. at 1859 (quotation marks and citations omitted).

      The *Ross* Court identified three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA.  *Id.* at 1859-60.  First,

"an administrative procedure is unavailable when (despite what regulations or guidance materials

may promise) it operates as a simple dead end—with officers unable or consistently unwilling to

provide any relief to aggrieved [incarcerated individuals]."  *Id.* at 1859.  "Next, an administrative

scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Finally,

an administrative remedy is not "available" when "prison administrators thwart [incarcerated

individuals] from taking advantage of a grievance process through machination,

misrepresentation, or intimidation."  *Id.* at 1860.  In *Williams v. Corr. Officer Priatno*, 829 F.3d

118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"  The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that an incarcerated individual has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at 216.  The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*.  *Id.*

### C.    Standard Governing Failure to Protect Claims

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of [incarcerated individuals] in their custody."  *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). To prevail on claim that officials failed to intervene, a plaintiff must show that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know the victim's constitutional rights were being violated; and (3) the officer d[id] not take reasonable steps to intervene."  *Tafari v. McCarthy*, 714 F. Supp. 2d 3174, 342 (N.D.N.Y. 2010) (Hurd, J., adopting Report and Recommendation by Lowe, M.J.).

To prevail on a claim that officials have failed to protect an incarcerated individual from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference.  *See Farmer*, 511 U.S. at 834; *see Hayes*, 84 F.3d at 620.  "[A] prison official has sufficient culpable intent if he has knowledge that an [incarcerated individual] faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate

the harm." *Hayes*, 84 F.3d at 620.  A plaintiff must show that prison officials actually knew of, but disregarded, an excessive risk to his safety: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020).

## III.    ANALYSIS

### A.    Whether Plaintiff Failed to Exhaust Available Administrative Remedies

After carefully considering the matter, the undersigned answers this question in the affirmative for the reasons set forth in Named Defendants' memoranda of law.  (Dkt. No. 48, Attach. 2 at 11-13; Dkt. No. 61 at 7-10.)  The following is intended to supplement, not supplant, those reasons.

Although Plaintiff appears to submit a grievance related to the subject of this lawsuit and implicitly alleges that he submitted that grievance to Great Meadow's IIGRC, he fails to identify any evidence in the record creating a genuine issue of fact for trial that he appealed that alleged grievance to CORC.  (*See generally* Dkt. No. 58.)  Notwithstanding Great Meadow IIGRC's alleged failure to respond to Plaintiff's grievance, Plaintiff was still required to completely exhaust administrative remedies in accordance with the applicable procedural rules, which included appealing to CORC.  *Woodford v. Ngo*, 548 U.S. 90-103 (2006).  Moreover, Plaintiff fails to identify any evidence in the record or even assert an argument that administrative remedies were unavailable to him.  (*See generally* Dkt. No. 58.)

As a result, I recommend that Plaintiff's claims be dismissed for failure to exhaust administrative remedies.

**B.    Whether, in the Alternative, Plaintiff's Claims Should be Dismissed Against Named Defendants Based on the Merits**

For the reasons set forth in Defendants' memoranda of law, I recommend that, in the alternative, Plaintiff's failure to protect claims against Named Defendants be dismissed on the merits. (Dkt. No. 48, Attach. 2 at 13-17; Dkt. No. 61 at 10.)[10]  The following is intended to supplement—not supplant—those reasons.

Plaintiff fails to present a genuine issue of fact for trial evincing that Named Defendants had a realistic opportunity to prevent the attack and did not take reasonable steps to intervene. Instead, as set forth by Named Defendants, the record establishes that, given the brevity of the attack, there was little time for Named Defendants to detect and intervene in the attack. (Dkt. No. 48, Attach. 2 at 13-17.)  Notwithstanding, within seconds of the start of the attack, pursuant to DOCCS protocol, officers were directing incarcerated individuals to place their hands on the walls and radioing for backup. (*Id*.)

As a result, I recommend that, in the alternative, Plaintiff's claims against Named Defendants be dismissed on the merits.

**ACCORDINGLY**, it is respectfully

---

[10]    However, to the extent that the Court rejects the undersigned's recommendation that Plaintiff's claims against Named Defendants be dismissed for failure to exhaust administrative remedies or, in the alternative, that Plaintiff's failure to protect claims be dismissed based on the merits, I recommend that the Court reject Named Defendants' arguments that they are entitled to qualified immunity.  Named Defendants appear to merely repeat arguments from elsewhere in their brief without meaningfully applying the law to the facts of the case. (Dkt. No. 48, Attach. 2 at 17 [arguing that "For the reasons explained in Part II *supra*, no rational jury could conclude that [Named] Defendants violated a statute or constitutional right based on the record evidence in this action."].)  Therefore, the undersigned recommends that "[t]he Court . . . deline[] to consider at this time whether [Named Defendants] are protected by qualified immunity."  *Osorio v. Westchester Cnty.*, 18-CV-5629, 2019 WL 3958443, at *1 n.2 (S.D.N.Y. Aug. 21, 2019).

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED**; and it is further respectfully

**RECOMMENDED** that Defendants John Doe #4 and John Doe #5 be *sua sponte* **DISMISSED** from this action without prejudice, due to Plaintiff's failure to identify and serve those defendants; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[11]

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.


Dated: December 15, 2023
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[11]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[12]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,
v.
Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq., Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel, Syracuse, NY, for Defendants Gunilla De Montaigu and Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

### *MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

 **\*1** Currently pending before the Court in the above-captioned action is a motion by Defendants containing two alternative requests for relief: (1) a request for reconsideration of Part III.D.5 of the Court's Decision and Order of May 5, 2009, denying Defendants' request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens;* and (2) a request for dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code. (Dkt. No. 61.) For the reasons set forth below, Defendants' motion is granted in part, and denied in part.

### I. REQUEST FOR RECONSIDERATION
To the extent that Defendants' motion requests reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No. 61.) The Order of which reconsideration was sought was entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y. L.R. 7.1(g) (setting ten-day deadline for motions for reconsideration). Defendants' attempt to characterize the Order of which reconsideration is sought as being the Court's Text Order of May 29, 2009, is unconvincing. That Text Order merely indicates the extent to which Plaintiffs' signed Third Amended Complaint fails to comport with the Court's Decision and Order of May 5, 2009 (and was issued in response to Plaintiffs' request for guidance). Even liberally construed, Defendants' motion for reconsideration expressly and repeatedly challenges the substance of the Court's Order of May 5, 2009 (specifically, Part III.D.5. thereof), and only that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61, Part 4, Points II and III.)

In any event, even if the Court were to consider the merits of Defendants' motion for reconsideration, the Court would deny that motion as without cause: there has been no intervening change of controlling law, no previously unavailable evidence, and there exists no clear error of law or manifest injustice with regard to the relevant portion of the prior decision in question.

For these reasons, Defendants' request for reconsideration is denied.

### II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF ACTION
To the extent that Defendants' motion alternatively requests the dismissal of the First Cause of Action of Plaintiffs' Third Amended Complaint (asserting a claim of violation of Panama law) as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response papers, to oppose this request. (*See* Dkt. No. 63.) The closest that Plaintiffs come to opposing this request is when, in a supplemental letter request, they (correctly) point out that Defendants have improperly broadened the target of their Panamanian-statute-of-limitations argument from Plaintiffs' First Cause of Action to all of Plaintiffs' causes of action. (Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2**  After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* ⚑ *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is ***GRANTED* in part,** and ***DENIED* in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is ***DENIED,*** however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is ***DISMISSED*** as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

### Footnotes

1      *See* *Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); ⚑ *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other
    remedies

    Representative for a social security payee
    failed to exhaust her administrative remedies
    before filing her claim since there was no
    final decision after a hearing. The Social
    Security Administration (SSA) garnished the
    representative's wages after attempting to work
    out a repayment plan since the representative
    was overpaid on behalf of the payee. The
    representative contacted the SSA to complain
    about the garnishment and shortly thereafter, the
    representative filed the action with the Small
    Claims Court, without having a hearing or final
    order from the Commissioner of Social Security.

    Social Security Act, § 205(g), 🏳 42 U.S.C.A. §
    405(g).

    27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* action filed
by Donna Este–Green ("Plaintiff") to recover funds allegedly
owed to her by the Social Security Administration, is a motion
by Michael J. Astrue, Commissioner of Social Security
("Defendant") to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) for lack of subject matter jurisdiction due to
Plaintiff's failure to exhaust her administrative remedies
before filing suit. (Dkt. No. 3.) Plaintiff has not opposed the
motion. For the reasons set forth below, Defendant's motion
is granted, and Plaintiff's Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 🏳 42 U.S.C. §§ 405(g)-🏳 (h)
and 🏳 1383(c)(3), "because Plaintiff's claim appeared to
relate to the payment of Social Security benefits to her as
representative payee for the account of Albertina King." (Dkt.
No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the
following: (1) Plaintiff had been overpaid as representative
payee; (2) Plaintiff had the right to question the decision

about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security

Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy." *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing

this action.[4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

## Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord,* *Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

---

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 25 of 100

McGee v. McGready, Not Reported in Fed. Supp. (2018)

2018 WL 2045094
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tony MCGEE, Plaintiff,

v.

Correction Officer MCGREADY, et al., Defendants.

16-CV-4187 (NSR)
|
Signed 04/30/2018

**Attorneys and Law Firms**

Tony McGee, Brooklyn, NY, pro se.

Colleen Kelly Faherty, State of New York Office of the Attorney General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

\*1 Plaintiff, Tony McGee ("Plaintiff"), an incarcerated pro se inmate at Sing Sing Correctional Facility, brings this action pursuant 42 U.S.C. § 1983 against Inmate Grievance Supervisor Anthony Black ("Black"), former Corrections Counselor Mary Jackson ("Jackson"), Sergeant Murray or Murphy ("Sgt. Murray"), Sergeant Poole ("Sgt. Poole") and several other corrections officers.[1] Before this court is Defendant Black and Jackson's motion to dismiss the amended complaint as against them based on failure to plead a plausible claim, failure to exhaust administrative remedies, and qualified immunity. For the foregoing reasons, the motion is GRANTED.

**FACTUAL BACKGROUND**

The following facts are taken from Plaintiff's Amended Complaint and are deemed true for the purpose of this motion.

Plaintiff alleges that on or about July 22, 2013, while in the mess hall he was assaulted by a fellow "gang related Hispanic inmate" who made a derogatory or offensive statement. In response to the statement, Plaintiff punched the inmate in the face resulting in an altercation. During the fight, Plaintiff was repeatedly punched about the face causing several lacerations. Plaintiff alleges that a "Black Correction Officer"[2] was

present in the mess hall, observed the incident, and failed to prevent it and/or failed to intervene.

On or about July 11, 2013, approximately eleven days prior to the altercation, Plaintiff spoke to Jackson and requested that he be placed in protective custody because he was threatened and being targeted by "gang-related Hispanic inmates." Jackson purportedly prepared a request for "voluntary protective custody," and informed Plaintiff he would be contacted sometime later. Later that day, Plaintiff was interviewed by Sgt. Murray concerning his request for protective custody. Plaintiff purportedly informed Sgt. Murray of the threats and being targeted. Plaintiff was once again informed he would be contacted sometime later. Plaintiff's request was not granted. Plaintiff suggests had he been placed in protective custody, as requested, he would not have been assaulted and injured. Additionally, Plaintiff asserts that Defendant Black failed to process multiple sick-call grievances by failing to forward them to Central Office Review Committee ("CORC"). Plaintiff asserts claims under the Eight and Fourteenth Amendments.

**STANDARD OF REVIEW**

**Rule 12(b)(6)**

On a 12(b)(6) motion, dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 555. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

\*2 Where a pro se Plaintiff is concerned, Courts must construe the pleadings in a particularly liberal fashion. Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). The Court must therefore interpret the pleading "to raise the strongest arguments that [it] suggest[s]." Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation

omitted). Nevertheless, a pro se plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level" (*Jackson v. N. Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) ), and the Court's duty to construe the complaint liberally is not "the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009).

**Exhaustion**

The Prison Litigation Reform Act ("PLRA") precludes the filing of an action "with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison or other correction facility until such administrative remedies as are available are exhausted." *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 122 (2d Cir. 2016) (internal quotations omitted). Whether an inmate has exhausted all administrative remedies turns on a review of "the state prison procedures [available] and the prisoner's grievance...." *See Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009) citing *Jones v. Bock,* 549 U.S. 199, 218 (2007). Grievances at DOCCS are governed by the Inmate Grievance Program ("IGP"), which is based on a three-tiered system. *Id.* at 125. To adjudicate an inmate complaint: "(1) the prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC"), (2) the prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility, and (3) the prisoner then may appeal an adverse decision by the superintendent to the CORC. *Id.;* see also N.Y. Comp. Codes. R. & Regs., tit. 7, § 701.7 (1999).

Notably, exhaustion is an affirmative defense, not a pleading requirement; thus, inmate plaintiffs need not "specially plead or demonstrate exhaustion in their complaints." *Jones,* 549 U.S. at 216. Instead, Defendants must demonstrate lack of exhaustion. *Colon v. N. Y.S. Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7432(NSR), 2017 WL 4157372, at *5 (S.D.N.Y. Sept. 15, 2017) citing *Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).

Dismissal on a 12(b)(6) motion for failure to exhaust is permissible where "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams,* 829 F.3d at 122; see also *Parris v. N.Y.S. Dep't Corr. Sews.,* 947 F. Supp. 2d 354, 261 (S.D.N.Y. 2013) (citing *Johnson v. Westchester Cnty. Dep't*

*of Con: Med. Dep't,* No. 10-CV-6309, 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) for proposition that denial of motion was appropriate where complaint was ambiguous as to exhaustion). Further, on such a motion, where a court is confined to the four corners of the complaint, the documents attached thereto, and things of which it is entitled to take judicial notice (see, e.g., *Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty,* 651 F.3d 318, 321 (2d Cir. 2011) ), a court is only permitted to consider outside documents related to exhaustion and submitted by defendants under limited circumstances. See, *Smith v. Miller,* No. 15-CV-9561 (NSR), 2017 WL 4838322, at *5 (S.D.N.Y. Oct. 23, 2017) (noting courts can take judicial notice of administrative records in Section 1983 cases in limited circumstances). Those include instances where "the complaint a) was the standard pro se form complaint that has a check-box regarding exhaustion, b) contained allegations clearly stating that the inmate had exhausted his administrative remedies, or c) clearly pointed to the fact that the inmate had, in fact, not exhausted." *Cohn,* 2017 WL 4157372, at *5.

**Qualified Immunity**

**\*3** "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818-19. It is within the Court's discretion to determine the order in which the two prongs are analyzed. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

DISCUSSION

Plaintiff asserts § 1983 claims under the Eighth Amendment against Defendants Black and Johnson. The essence of Plaintiff's claim is a failure to protect. Plaintiff's complaint suggest that Defendants' failure in processing or approving his request for voluntary confinement resulted in

his subsequent assault. Or, construing the allegations liberally as the Court is required to do, but for Defendants' failure in placing him in voluntary protective custody, Plaintiff would not have been attacked and injured by a fellow inmate.

Plaintiff's 1983 complaint is that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth. See Estelle v. Gamble, 429 U.S. 97, 102 (1976) citing Robinson v. California, 370 U.S. 660 (1962). "To prevail on an Eighth Amendment claim, an inmate must first show that his injury is objectively a 'sufficiently serious' one." Brims v. Burdi, No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004)Brims v. Burdi, No. 03-CV-3159 (WHP), 2014 WL 1403281, at *2 (S.D.N.Y. June 23, 2004) quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). Additionally, a plaintiff must "show that the defendant had knowledge of [the] prisoner's problem and was deliberately indifferent to [the] prisoner's plight." Calhoun v. N. Y State Div. of Parole Officers, 999 F.2d 647, 654 (2d Cir. 1993) citing Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989).

Deliberate indifference requires a showing that the conditions of incarceration posed a substantial risk of serious harm, and that prison officials possessed sufficient culpable intent. Hayes v. New York City Dep't Of Correc., 84 F.3d 614, 620 (2d Cir. 1996) citing Farmer v. Brennan, 511 U.S. 825, 834 (1994).The deliberate indifference requires a two prongs analysis: substantial risk of serious harm, objective prong; and sufficient culpable intent, subjective prong. Farmer, 511 U.S. at 834; Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). Here, the objective prong is meet and not disputed.

Subjectively, the prison official acts with the requisite sufficient culpable state of mind when he (or she) "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620. Courts have denied deliberate indifference claims based upon surprise attacks. See Fernandez v. N.Y.C. Dep't of Corr., No. 08-CV-4294 (KMW), 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010); Zimmerman v. Macomber, No. 95-CV-0882(DAB), 2001 WL 946383 (S.D.N.Y. Aug.

21, 2001). Plaintiff alleges he provided advance notice to Jackson and Black of threats and a possible attack. Plaintiff's allegation also suggest he identified the attacker(s), "gang related Hispanic inmates" at the facility. Plaintiff's allegations suggest that Black and Jackson failed to take reasonable measures to abate the impending attack. Thus, Plaintiff has pled a plausible Eighth Amendment claim.

**\*4** Plaintiff's Eighth Amendment claim, however, fails for failure to exhaust his administrative remedies. This case involves the use of the pro se form complaint which contains the equivalent of a check-box exhaustion section. The amended complaint is clear as to whether Plaintiff alleges he grieved his claims. Plaintiff explicitly states he filed grievances concerning, *inter alia,* the "5 sick call request," the "non-protection grievances" and the "foreseeable assault." (See Amended Compl., Sect. IV., E (1).) Because the exhaustion issue is an integral part of the prisoner's claims, the Court may refer to materials outside of the complaint on a 12(b)(6) motion in determining whether a plaintiff has exhausted. See Smart v. Goode, No. 04-CV-8850 (RWS), 2008 WL 591230, at *2 (S.D.N.Y. Mar. 3, 2008) (recognizing that the Court's previous opinion "[did] not faithfully capture the subtlety of exhaustion doctrine in the Second Circuit" and that the Court should have addressed non-exhaustion as an affirmative defense).

In support of their motion, Defendants submit a declaration from Karen Bellamy ("Bellamy"), the Director of the Inmate Grievance Program ("IGP"). Bellamy avers that she is the custodian of records maintained by the CORC, which is tasked with rendering administrative decisions on grievances filed by inmates. Based upon her review of the records, she found that Plaintiff made other complaints concerning meals, conditions of the facility, and "problems with security staff" on December 17, 2013. Plaintiff, however, did not file a grievance concerning the July 22nd incident nor his request for voluntary confinement. Though Plaintiff attempts to rebut Defendants' showing, mere conclusory statements in opposition is insufficient. Accordingly, Plaintiff's Eighth Amendment claims must be dismissed.

Plaintiff also asserts a claim based on Defendant Black's failure to process his grievances, including his "5 sick call grievances." It is well settled that in order to succeed on a § 1983 claim, Plaintiff must show that he has been deprived of a constitutional or other federal right. 42 U.S.C. § 1983. Inmate grievances procedures are undertaken voluntarily by

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 28 of 100

McGee v. McGready, Not Reported in Fed. Supp. (2018)

the states and are not constitutionally required. *Johnson v. New York City Dep't of Health,* No. 06-CV-13699 (BSJ) (FM), 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (internal citation omitted). Accordingly, a failure to process a prisoner's grievance(s) does not in itself give rise to a constitutional claim. *Swift v. Tweddell,* 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (internal citations omitted). This claim must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. Plaintiff's Eighth Amendment and claims premised on the failure to process his grievances are dismissed. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 29. The parties are directed to confer, complete and submit to the Court a completed case management plan (blank form attached) within thirty (30) days of the date of this opinion.

SO ORDERED.

Attachment

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. Jan. 2002

-------------------------------------------------------------x

Plaintiff(s),

CIVIL CASE DISCOVERY PLAN
AND SCHEDULING ORDER

- against -

Defendant(s).

_____ CV _____ (NSR)

-------------------------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.   All parties [consent] [do not consent] to conducting all further proceedings before a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c). The parties are free to withhold consent without adverse substantive consequences. (If all parties consent, the remaining paragraphs of this form need not be completed.)

2.   This case [is] [is not] to be tried to a jury.

3.   Joinder of additional parties must be accomplished by _____.

4.   Amended pleadings may be filed until _____  _____.

5.   Interrogatories shall be served no later than _____, and responses thereto shall be served within thirty (30) days thereafter.  The provisions of Local Civil Rule 33.3 [shall] [shall not] apply to this case.

6.   First request for production of documents, if any, shall be served no later than _____.

7.   Non-expert depositions shall be completed by ____  _____  _____.

     a.   Unless counsel agree otherwise or the Court so orders, depositions shall not be held until all parties have responded to any first requests for production of documents.

     b.   Depositions shall proceed concurrently.

     c.   Whenever possible, unless counsel agree otherwise or the Court so orders, non-party depositions shall follow party depositions.

8.   Any further interrogatories, including expert interrogatories, shall be served no later than _____.

9.   Requests to Admit, if any, shall be served no later than _____.

10.  Expert reports shall be served no later than _____.

11.  Rebuttal expert reports shall be served no later than _____.

12.  Expert depositions shall be completed by _____.

13.  Additional provisions agreed upon by counsel are attached hereto and made a part hereof.

14.  **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.  Any motions shall be filed in accordance with the Court's Individual Practices.

16.  This Civil Case Discovery Plan and Scheduling Order may not be changed without leave of Court (or the assigned Magistrate Judge acting under a specific order of reference).

17.  The Magistrate Judge assigned to this case is the Hon. _____.

18.  If, after entry of this Order, the parties consent to trial before a Magistrate Judge, the Magistrate Judge will schedule a date certain for trial and will, if necessary, amend this Order consistent therewith.

19.  The next case management conference is scheduled for _____, at _____. (The Court will set this date at the initial conference.)

SO ORDERED.

Dated: White Plains, New York
     _____

_____
Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2045094

## Footnotes

1       The operative complaint is the Amended Complaint filed February 2, 2017. (ECF No. 22.)

2       In his complaint, Plaintiff appears to identify the "Black Correction Officer" as C.O. Javier Caban.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 981849
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Robert JACKSON, Plaintiff,

v.

C.O. Angela JACKSON, et al., Defendants.

16-CV-08516 (PMH)

|

Signed 03/16/2021

**Attorneys and Law Firms**

Robert Jackson, Beacon, NY, pro se.

Amanda Yoon, NYS Office of the Attorney General, New York, NY, Rebecca Lynn Johannesen, Colorado Department of Law, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP M. HALPERN, United States District Judge:

**\*1** Plaintiff Robert Jackson ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, brings this action under 42 U.S.C. § 1983 against Correction Officers Angela Jackson, M. Walker, and J. James (collectively, "Defendants"). (Doc. 2, "Compl."). Specifically, Plaintiff alleges that in June 2015 —while incarcerated at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing")—Defendants violated his constitutional rights by: (1) using excessive force against him, in violation of the Eighth Amendment; and (2) filing a false internal complaint against him, in violation of the Fourteenth Amendment. (*See generally id.*).

On July 10, 2017, Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's due process claim along with all claims for monetary damages against them in their official capacities. (Doc. 16). By Opinion & Order dated April 20, 2018, Judge Román granted Defendants' motion and granted Plaintiff leave "to file an Amended Complaint ... on or before June 19, 2018." (Doc. 19 at 8). Despite securing an extension of the time within which to file his amended pleading, Plaintiff failed to do so. Consequently, the only claim remaining in this action is one for excessive force against Defendants in their individual capacities.

Defendants filed an Answer on August 30, 2018 (Doc. 22) and, with leave of Court, filed an Amended Answer on October 2, 2019. (Doc. 29, "Am. Ans."). Shortly thereafter, in an Order issued on October 22, 2019, Judge Román "waive[d] the Initial Pre-trial Conference and direct[ed] the parties to confer and complete a Case Management Plan and Scheduling Order...." (Doc. 30). Although Plaintiff filed a proposed discovery plan on November 19, 2019 (Doc. 32), Defendants filed a letter the following day to request both an extension of time within which to submit a proposed discovery schedule and a pre-motion conference to discuss an anticipated motion for summary judgment on the sole issue of administrative exhaustion (Doc. 31). There was no further activity on the docket in this case until it was reassigned to this Court in April 2020. [1]

On April 13, 2020, the Court granted Defendants' request, set a briefing schedule for the extant summary judgment motion, and directed Defendants to mail a copy of that Order to Plaintiff; Defendants filed an affidavit of service the same day. (Doc. 33; Doc. 34). Approximately one month later, on May 6, 2020, Defendants filed a letter requesting an extension of the briefing schedule. (Doc. 36). In that letter, Defendants noted also that upon "confer[ring] with the New York State Division of Parole," they had learned that Plaintiff had been released from custody and was believed to be residing at an address in New York, New York. (*Id.*). In an endorsement dated May 7, 2020, the Court granted Defendants' request to extend the briefing schedule and directed Defendants to serve a copy of that Order on Plaintiff; Defendants filed an affidavit of service the next day indicating that the Order had been mailed to Plaintiff's address in New York City. (Doc. 37; Doc. 38).

**\*2** Defendants filed their motion for summary judgment on June 15, 2020. (Doc. 39; Doc. 40, "Def. Br."). On July 23, 2020, Defendants filed a letter noting that Plaintiff's time to oppose the pending motion had passed and requesting that the Court consider the motion unopposed. (Doc. 44). The Court endorsed the letter on July 24, 2020, extended Plaintiff's time to file an opposition to August 24, 2020 *sua sponte*, and advised that "[i]f plaintiff fails to file his opposition by August 24, 2020, the motion will be deemed fully submitted and unopposed." (Doc. 45). The Court also instructed Defendants to serve a copy of that Order on Plaintiffs (*id.*); Defendants filed an affidavit of service that reflected mailings to both Fishkill and the address in New York City shortly thereafter. (Doc. 46). The Court has received no communications from

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 31 of 100

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Plaintiff since November 2019 and, as such, considers the motion fully submitted and unopposed.

For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

## BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement (Doc. 42, "56.1 Stmt."), and the admissible evidence submitted by the parties. [2]

### I. The Underlying Incident

Plaintiff's factual allegations, *in toto*, are as follows:

> After an arguement [sic] with C.O. Jackson in the messhall[,] I was taken to the bridge area where the defendants beat me into a seizure, then fabricated a misbehavior report to justify their actions.

(Compl. at 4). Plaintiff maintains that this incident occurred on June 4, 2015. (*Id.*).

### II. Plaintiff's Grievance

Plaintiff filed the Grievance on June 17, 2015. (Quick Aff. ¶ 9; Quick Ex. B). Therein, Plaintiff complained that as he "was walking out [of] the messhall" on June 4, 2015, "C.O. Ms. Jackson and ... other[s] ... beat me down...." (Quick Ex. B). On August 14, 2015, following an investigation into Plaintiff's complaint, the Sing Sing Superintendent issued a written decision denying the Grievance. (Quick Aff. ¶ 11; Quick Ex. C). In full, the Superintendent's written decision reads as follows:

> Grievant claims staff harassment.
>
> The grievant was interviewed by a supervisor. The grievant had nothing further to add to his original complaint and provided no witnesses.

> Staff involved were interviewed and provided a written report denying the allegations of wrongdoing or harassing the grievant.
>
> Based on the investigation conducted, insufficient evidence could be found to substantiate the grievant [sic] allegations. Grievance is denied.

(Quick Ex. C). The Superintendent's decision advised that Plaintiff had seven days to appeal the determination to CORC, should he choose to do so (*id.*); however, there is no record that Plaintiff ever appealed to CORC (Quick Aff. ¶ 12; Seguin Aff. ¶¶ 6-7; Seguin Ex. B).

## STANDARD OF REVIEW

**\*3** Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " ⚐ *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting ⚐ *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). " 'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at \*1 (S.D.N.Y. Apr. 17, 2013) (quoting ⚐ *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial...." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting ⚐⚠ *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 32 of 100

"It is the movant's burden to show that no genuine factual dispute exists," 🏷️ *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing 🏷️ *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing 🏷️ *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." 🏷️ *Liverpool*, 442 F. Supp. 3d at 722 (quoting 🏷️ *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts...." *Id.* (quoting 🏷️ *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." 🏷️ *Sood*, 2013 WL 1681261, at \*2 (citing 🏷️ *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting 🏷️ *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. 🏷️ *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when ... law supports the moving party"); 🏷️ *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant ... is proper"). This standard applies equally to claims for relief and affirmative defenses. 🏷️ *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010) ("The same standard applies whether summary judgment is granted on the merits or on an affirmative defense...."). [3]

**\*4** The Court is, of course, mindful that "[*p*]*ro se* litigants are afforded a special solicitude," which includes reading their filings "to raise the strongest arguments they suggest." 🏷️ *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at \*9 (S.D.N.Y. Mar. 29, 2018) (internal quotation

marks omitted). "It is through this lens of leniency towards *pro se* litigants that this Court must consider a defendant's motion for summary judgment against a *pro se* plaintiff," 🏷️ *Adams v. George*, No. 18-CV-2630, 2020 WL 5504472, at \*5 (S.D.N.Y. Sept. 8, 2020), but the mere fact that a litigant is *pro se* "does not relieve the plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment," 🏷️ *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks omitted). Where, as here, a *pro se* litigant fails to oppose a motion for summary judgment, the motion may be granted as unopposed only "if: (1) the plaintiff has received adequate notice that failure to file any opposition may result in dismissal of the case; and (2) the Court is satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *McNair v. Ponte*, No. 17-CV-2976, 2020 WL 3402815, at \*3 (S.D.N.Y. June 18, 2020) (quoting *Warren v. Chem. Bank*, No. 96-CV-6075, 1999 WL 1256249, at \*2 (S.D.N.Y. Dec. 22, 1999)). [4]

## ANALYSIS

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under 🏷️ section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as available are exhausted." 🚩 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting 🏷️ *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), and it is "'mandatory': [a]n inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." 🏷️ *Ross v. Blake*, 136 S.Ct. 1850, 1856 (2016) (citation omitted). "Moreover, the PLRA 'requires proper exhaustion, which means using all steps that the prison grievance system holds out.'" *Ayala-Rosario v. Westchester Cty.*, No. 19-CV-3052, 2020 WL 3618190, at \*4 (S.D.N.Y. July 2, 2020) (quoting 🏷️ *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016)). This "means that 'prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself.'" *Gottesfeld v. Anderson*,

Jackson v. Jackson, Not Reported in Fed. Supp. (2021)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 33 of 100

No. 18-CV-10836, 2020 WL 1082590, at *6 (S.D.N.Y. Mar. 6, 2020) (quoting 🚩 *Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012)). Accordingly, the Court looks to the process available to Plaintiff. *See Dinkins v. New York*, No. 19-CV-08447, 2020 WL 5659554, at *6 (S.D.N.Y. Sept. 23, 2020).

There are three levels of review for inmate grievances at Sing Sing. *See generally* 🚩 *Amador v. Andrews*, 655 F.3d 89, 96-97 (2d Cir. 2011) (outlining the three-step process). First, a grievance is reviewed by the Inmate Grievance Resolution Committee ("IGRC"), a facility-level body consisting of inmates and facility staff members. (Quick Ex. A §§ 701.4, 701.5(a)-(b); Senguin Ex. A §§ 701.4, 701.5(a)-(b)). Second, should the inmate be dissatisfied with the IGRC's determination, he may appeal that decision to the Superintendent. (Quick Ex. A § 701.5(c); Senguin Ex. A § 701.5(c)). Finally, if the Superintendent's conclusions are unfavorable, the inmate may appeal that decision to CORC. (Quick Ex. A § 701.5(d); Senguin Ex. A § 701.5(d)). However, when a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance. (*See* Quick Ex. A § 701.8; Senguin Ex. A § 701.8). Both the Superintendent and CORC are required to "date stamp all" grievances or appeals forwarded to them for review (Quick Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i); Senguin Ex. A §§ 701.5(c)(3), 701.5(d)(3)(i)) and require entities to maintain files "for the current calendar year plus the previous four calendar years" (Quick Ex. A § 701.6(k)(3); Senguin Ex. A § 701.6(k) (3)).

 **\*5** Quick represents, as custodian of records maintained by the IGP at Sing Sing, that grievances "are collected from the IGRC mailbox and processed" daily, in accordance with DOCCS procedures. (Quick Aff. ¶ 5). Quick's records reveal that Plaintiff filed the Grievance on June 17, 2015, that the Grievance was forwarded directly to the Superintendent as one concerning staff harassment, and that the Superintendent performed an investigation and issued a written decision denying the Grievance on August 14, 2015. (*Id.* ¶¶ 9-11; Quick Ex. B). However, both Quick and Seguin represent affirmatively that they have no record of Plaintiff taking the final step of appealing the Superintendent's decision to CORC. (Quick Aff. ¶12; Seguin Aff. ¶¶ 6-7).

Even while granting Plaintiff—who filed nothing in opposition to this motion, and, in fact, has filed nothing in this case at all since November 2019 (*see* Doc. 32)—every conceivable benefit of the doubt to which a *pro se* litigant is entitled, there is no genuine issue of material fact on the instant motion. Consequently, summary judgment is proper here because: (1) Defendants established that Plaintiff failed to exhaust his administrative remedies and, as such, also their entitlement to summary judgment on the affirmative defense of Plaintiff's failure to exhaust his administrative remedies as required by the PLRA; and (2) Plaintiff was warned that failure to file an opposition would result in the Court concluding that the motion was unopposed. [5]

## CONCLUSION

Based upon the foregoing, the motion for summary judgment is GRANTED.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2021 WL 981849

## Footnotes

1    There are two docket entries reflecting reassignment of this matter from Judge Román to this Court on different dates. (*See* Apr. 3, 2020 Entry; Apr. 13, 2020 Entry).

2    In support of the instant motion, defense counsel filed a Declaration annexing two affidavits (with exhibits) for the Court's consideration. (Doc. 41). The first affidavit is from Quandera T. Quick ("Quick"), the Inmate Grievance Program ("IGP") Supervisor at Sing Sing. (Doc. 41-1, "Quick Aff." ¶ 1). This affidavit attaches as exhibits copies of: (1) New York State Department of Corrections and Community Supervision Directive

("DOCCS") No. 4040 (*id.* 5-21, "Quick Ex. A"); (2) Plaintiff's June 4, 2015 Grievance ("Grievance") (*id.* at 22-23, "Quick Ex. B"); and (3) the written decision issued by Michael Capra, Sing Sing's Superintendent, on August 14, 2015 (*id.* at 24-25, "Quick Ex. C"). The second affidavit is from Rachael Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS and custodian of records for the Central Office Review Committee ("CORC"). (Doc. 41-2, "Seguin Aff."). This affidavit attaches as exhibits copies of: (1) DOCCS Directive No. 4040 (*id.* at 4-20, "Seguin Ex. A"); and (2) the results of a search for appeals filed with the CORC (*id.* at 21-23, "Seguin Ex. B").

3    "[T]he failure to exhaust administrative remedies in compliance with the [Prison Litigation Reform Act] is an affirmative defense" and it "may be waived" by a defendant who fails to raise it. *Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 693 n.3 (S.D.N.Y. 2016) (internal quotation marks omitted). Here, Defendants' Fourth Affirmative Defense was failure to comply with 42 U.S.C. § 1997e. (Am. Ans. ¶ 14).

4    Given the Court's conclusion that there is no genuine issue of material fact as to exhaustion, it does not need to reach Defendants' request for an evidentiary hearing should the Court find otherwise.

5    Even if the Court did not grant Defendants' motion for summary judgment, it would dismiss the action with prejudice under Federal Rule of Civil Procedure 41(b) as a result of Plaintiff's failure to prosecute this action. Indeed, Plaintiff has not filed anything in this case since he filed a proposed discovery schedule more than a year ago.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 35 of 100

2022 WL 3020254
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael RUIZ, Plaintiff,

v.

P. LINK, J. Reyes, Patrick Squire, Michael Blot,
Deborah Macdonald, and John Does #1-3, Defendants.

No. 20-CV-235 (CS)
|
Signed July 29, 2022

**Attorneys and Law Firms**

Michael Ruiz, Comstock, New York, Pro Se Plaintiff.

Kathryn Martin, Assistant Attorney General, Office of the
Attorney General of the State of New York, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendants' motion for summary
judgment. (ECF No. 66.) For the reasons set forth below,
Defendants' motion is GRANTED.

**I. BACKGROUND**
The following facts are based on Defendants' Local Civil
Rule 56.1 Statement, (ECF No. 68 ("D's 56.1 Stmt.")), and
supporting materials, and are undisputed unless otherwise
noted. [1]

**A. Facts**
Plaintiff Michael Ruiz is incarcerated in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"). (D's 56.1 Stmt. ¶ 1.) Plaintiff's
claims arose while he was held at Green Haven Correctional
Facility. (*Id.* ¶ 2.) Plaintiff brings this lawsuit in connection
with an altercation in the prison yard on April 6, 2019 and
the medical treatment he received thereafter. (*Id.* ¶¶ 3-4.)
He alleges excessive force claims against Defendants Link,
Reyes, Squire and Blot, and a claim of deliberate indifference
to medical needs against Defendant MacDonald. [2]

**\*2** The altercation and medical treatment at issue occurred
on April 6, 2019. (Ds' 56.1 Stmt. ¶¶ 3-4.) That same day,
Plaintiff was transferred from Green Haven to Sing Sing
Correctional Facility. (*Id.* ¶ 22.) While at Sing Sing, Plaintiff
filed a grievance, dated April 9, 2019, [3] alleging that on
April 6, 2019, correction officers used excessive force against
him, and medical staff failed to properly treat him. (D's 56.1
Stmt. ¶ 24; *see* ECF No. 71-6.) The grievance was denied
by the Sing Sing Superintendent on July 26, 2019. (D's 56.1
Stmt. ¶ 25; ECF No. 71-7.) Plaintiff testified at his deposition
that he did not receive a copy of the Superintendent's denial
until October 9, 2019, when he received a memo from Sing
Sing's Inmate Grievance Program ("IGP") Supervisor, dated
August 30, 2019. (P's Depo. at 79:22-80:13; *see* ECF No.
65-6.) The letter informed Plaintiff that his grievance had
been answered on July 26, 2019 and forwarded to Plaintiff at
that time; the Supervisor included with the memo a copy of
the Superintendent's July 26 denial. (*Id.*) The bottom portion
of the Superintendent's denial letter is a form the inmate
can fill out if he wishes to appeal; it states, "[R]eturn this
copy to your Inmate Grievance Clerk." (ECF No. 71-7.) [4]
By the time Plaintiff received the letter and the copy of
the Superintendent's denial on October 9, Plaintiff had been
transferred out of Sing Sing and was being held in the Special
Housing Unit ("SHU") at Elmira Correctional Facility. (Ds'
56.1 Stmt. ¶ 26; P's Depo. at 78:8-19, 78:25-79:21.) [5]

DOCCS records reflect that the Central Office Review
Committee ("CORC") never received any appeal of the
Superintendent's denial of Plaintiff's grievance. (D's 56.1
Stmt. ¶ 28.) Further, DOCCS records reflect that CORC did
not receive any correspondence from Plaintiff at all during
2019 or 2020. (*Id.* ¶ 29; *see* ECF No. 70 ("Seguin Decl.")
¶ 13.) Plaintiff asserted in his deposition that he filled out
the appeal form on October 10, 2019 and "forwarded it to
CORC ... [b]y mail." (P's Depo. at 80:24-81:4; *see id.* at
82:20-83:7.) Plaintiff did not specify the address to which he
mailed the appeal, but stated that he requested and received
the address from the law library. (*Id.* at 82:3-19.) Plaintiff did
not receive an acknowledgement of receipt or answer from
CORC. (*Id.* at 81:5-7.) After several months, he filed this
lawsuit. (*Id.* at 81:8-13.)

**B. Procedural History**
Plaintiff filed his original complaint on January 8, 2020,
bringing claims under 42 U.S.C. § 1983 against eight

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 36 of 100

Green Haven employees in their individual capacities for violations of the Eighth Amendment. (ECF No. 2.) The case was reassigned to me on February 14, 2020. At a pre-motion conference on August 28, 2020 in anticipation of a potential motion to dismiss, I granted Plaintiff leave to amend his Complaint. (*See* Minute Entry dated Aug. 28, 2020.) The Amended Complaint was filed on September 18, 2020. (ECF No. 30.) Defendants answered on April 8, 2021. (ECF No. 44.)

On May 11, 2021, I held a status conference and set a discovery schedule, (ECF No. 51), which was extended twice, (ECF Nos. 57, 60). At the close of discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment. (ECF No. 64.)[6] I held a pre-motion conference on November 16, 2021 and set a briefing schedule for Defendants' motion. (*See* Minute Entry dated Nov. 16, 2021.) On December 29, 2021, Defendants filed their motion papers. (ECF Nos. 66-71.) Plaintiff's opposition was initially due on January 27, 2022. Approximately one to two weeks before the due date Plaintiff left two phone messages with my chambers, requesting an extension of the briefing schedule and permission to file a motion to obtain counsel. (*See* ECF No. 74.) On January 19, 2022, I entered an Order extending Plaintiff's time to respond to the motion to February 28, 2022, and advising him of his right to file a motion asking the Court to seek volunteer counsel. (*Id.*) On March 18, 2022, I received a letter from Plaintiff (dated March 14, 2022), indicating that his opposition was ready, and he just wanted permission to file it late; I granted an extension to April 6, 2022, and noted there would be no further extensions. (ECF No. 76.) On April 28, 2022, after no opposition was received, I deemed the motion fully submitted. (ECF No. 78.)

## II. LEGAL STANDARD

**\*3** Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials ...." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the ... declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). Where, as here, the non-moving party fails to respond to the movant's summary judgment motion, "the district court may not grant the motion without first examining the moving party's submission to determine if it

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 37 of 100

has met its burden of demonstrating that no material issue of fact remains for trial." 🚩 *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (cleaned up). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." *Id.* (cleaned up) (emphasis omitted).

## III. DISCUSSION

### A. Exhaustion Under the PLRA

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under 🚩 section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 🚩 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes." 🚩 *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The PLRA mandates that a plaintiff use "all steps that the agency holds out, and do[ ] so properly" – that is, in accordance with the applicable agency rules. 🚩 *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (cleaned up). Exhaustion of available administrative remedies "must be complete prior to commencement of suit" and "[t]he fact that a grievance is filed, or the process is completed, subsequent to commencement of suit will not salvage an otherwise premature filing." *Chalif v. Spitzer*, No. 05-CV-1355, 2008 WL 1848650, at *13 (N.D.N.Y. Apr. 23, 2008) (cleaned up).

**\*4** For inmates in New York State prison, administrative exhaustion requires compliance with DOCCS' three-tiered IGP, in which (1) the inmate must file a grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence, (2) the inmate must then appeal an adverse decision by the IGRC to the superintendent of the facility within seven days after receipt of the IGRC's response, and (3) the inmate must then appeal an adverse decision by the superintendent to the CORC within seven days after receipt of the superintendent's response. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2022); *McGee v. McGready*, No. 16-CV-4187, 2018 WL 2045094, at *2 (S.D.N.Y. Apr. 30, 2018).

"[W]hen a grievance concerns staff harassment, DOCCS procedures provide for an expedited review that allows for the complaint to bypass IGRC review and proceed before the Superintendent in the first instance." *Jackson v. Jackson*, No. 16-CV-8516, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021); *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8. Under the expedited procedure, the Superintendent has twenty-five days to respond to the grievance. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(f). If the Superintendent fails to respond within twenty-five days, the inmate may appeal directly to CORC. *Id.* § 701.8(g). If the Superintendent does respond, the inmate has seven days from receipt of the response to appeal to CORC. *Id.* § 701.8(h). The IGP Supervisor has discretion to grant exceptions to the time limits for filing or appealing grievances. *See id.* § 701.6(g). Whether or not the Superintendent timely responds, the procedure to appeal a determination of the Superintendent to CORC is to file "a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g)-(h). [7] Inmates who have been transferred to a different facility can get their appeal to the appropriate grievance clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2).

CORC is required to provide, through IGP staff, written confirmation that an appeal has been received, and if the inmate does not receive such confirmation within forty-five days, he "should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." *Id.* § 701.5(d)(3)(i). The IGP requires CORC to respond to an appeal within thirty days of receipt. *Id.* § 701.5(d)(3)(ii). If CORC has received an appeal and fails to within those thirty days, the inmate is considered to have exhausted his administrative remedies and may file suit. 🚩 *Hayes v. Dahlke*, 976 F.3d 259, 270 (2d Cir. 2020).

### B. Plaintiff's Failure to Exhaust

Defendants have met their burden to demonstrate that Plaintiff failed to follow IGP procedures with regard to his CORC appeal and that CORC never received Plaintiff's appeal. Accordingly, Plaintiff failed to "properly" exhaust administrative remedies prior to filing suit. *See* 🚩 *Amador*, 655 F.3d at 96.

Plaintiff testified that once he received the Superintendent's adverse decision on October 9, 2021, he filled out the appeal statement and "forwarded it to CORC ... [b]y mail." (P's Depo.

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 38 of 100

at 80:24-81:4.) He never received confirmation that his appeal was received or any response from CORC, and after a few months he filed this lawsuit. (*Id.* at 81:8-13.)

The IGP required Plaintiff to forward the appeal to the Inmate Grievance Clerk. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.8(g)-(h). The form at the bottom of the Superintendent's letter also notified Plaintiff that the appeal to CORC had to be transmitted via the Inmate Grievance Clerk. (*See* ECF No. 71-7.) The IGP specifically provides that Plaintiff, having been transferred to a different facility from that in which he originally filed his grievance, should get his appeal to the proper Inmate Grievance Clerk by "mail[ing] the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed." *Id.* § 701.6(h)(2). Nothing in the record indicates that Plaintiff followed this procedure; rather, it appears he tried to mail his appeal directly to CORC, and CORC never received the document. (*See* Seguin Decl. ¶¶ 12-13 (CORC never received appeal of Plaintiff's grievance, nor did it receive any other correspondence from Plaintiff during 2019 or 2020); ECF No. 71-8 (CORC records showing no receipt of appeal)).

**\*5** Accordingly, Plaintiff failed to properly follow the grievance procedure and has failed to exhaust his administrative remedies. *See Valverde v. Folks*, No. 19-CV-8080, 2022 WL 836310, at \*6 (S.D.N.Y. Mar. 21, 2022) ("Plaintiff did not properly comply with [the] prison grievance procedural rules. Plaintiff ... mailed his appeal statement directly to CORC. However, to appeal a decision denying a grievance, an inmate must submit the appeal, not directly to CORC, but to the grievance supervisor of the facility where the grievance was originally filed for forwarding to that facility's grievance clerk."); *Wilkinson v. Banks*, No. 2-CV-361, 2007 WL 2693636, at \*6 (W.D.N.Y. Sep. 10, 2007) ("[N]o dispute exists that [the *pro se* plaintiff] did not follow correct procedure in attempting to appeal that grievance to CORC. He did not file his appeal with the Inmate Grievance Clerk as required by the regulations, but rather mailed it directly to CORC.") (cleaned up).

## C. Availability of Administrative Remedies

Although the Supreme Court has deemed exhaustion mandatory, there are circumstances under which administrative remedies may be deemed "unavailable" to an inmate, such that an inmate is not required to exhaust. *Ross v. Blake*, 578 U.S. 632, 642 (2016). The Supreme Court identified three circumstances where administrative

remedies may be unavailable. *See id.* at 643-44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 643. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644. "If the defendant has met its burden of establishing the existence and applicability of the grievance policy, the *plaintiff* bears the burden of establishing *de facto* unavailability." *Saeli v. Chautauqua County*, 36 F.4th 445, 453 (2d Cir. 2022) (emphasis in original).

Plaintiff has submitted no opposition to the instant motion and has not argued that administrative procedures were unavailable to him. *See Dowling v. Barkman*, No. 17-CV-647, 2019 WL 7971868, at \*5 (N.D.N.Y. Dec. 20, 2019) ("Given Plaintiff's failure to oppose the Motion, no basis appears on the record for concluding that DOCCS' grievance procedure was unavailable to him."), *report and recommendation adopted sub nom. Dowling v. Schleicher*, 2020 WL 103480 (N.D.N.Y. Jan. 8, 2020). Even if that were not the case, the record does not reflect that any of the above-listed circumstances apply.

First, nothing in the record suggests that Plaintiff did not receive a response from CORC because the grievance process was operating as a "dead end" – rather, it appears that CORC never received Plaintiff's appeal because of Plaintiff's failure to send the appeal to the appropriate official. (*See* P's Depo. at 80:24-81:4; Seguin Decl. ¶¶ 12-13; ECF No. 71-8.) Similarly, the record is bereft of evidence that the IGP is unavailable to inmates generally. *See White v. Veile*, 709 F. App'x 35, 38 (2d Cir. 2017) (summary order) (affirming summary judgment for failure to exhaust administrative remedies where plaintiff did not "present[ ] any evidence about the outcomes in the grievance system in general" or "show[ ] that prison officials are consistently unwilling to grant relief").

Second, as set out above, the relevant procedures are not opaque. The IGP clearly sets out the process for appealing a grievance to CORC through the Inmate Grievance Clerk – including the instructions under § 701.6(h)(2) for an inmate who has been transferred from one facility to another to send

an appeal to the appropriate facility's IGP Supervisor. Plaintiff testified that he is familiar with the grievance process, (*see* P's Depo. at 18:3-19:6), and the Superintendent's denial stated that the appeal to CORC had to go through the Inmate Grievance Clerk, (*see* ECF No. 71-7).

**\*6** Third, while there is some evidence in the record that Plaintiff sought information from the "law library officer" while he was in the SHU at Elmira and appears to have been given a mailing address for CORC, [8] this fact alone is insufficient to establish that a prison official thwarted his ability to successfully appeal to CORC. Plaintiff has not suggested that he asked how to appeal and was told to mail his appeal to CORC, or that he asked the law library officer for anything other than the address of CORC. There is simply no evidence of machination, intimidation or misrepresentation.

That the breakdown of the grievance procedure here was due to Plaintiff's failure to follow it, rather than to its unavailability, is highlighted by the fact that when Plaintiff did not receive confirmation that CORC was in possession of his appeal within the forty-five days envisioned by the regulations, instead of following the IGP and writing to Sing Sing's IGP Supervisor – an official with whom he had recently communicated, (*see* P's Depo. at 79:22-80:13, 81:14-21) – to confirm that the appeal was filed, *see* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(3)(i), he simply waited a few months and then filed this lawsuit. (P's Depo. at 79:25-80:8, 81:5-13). [9]

In short, "[g]iven the lack of evidence that Plaintiff's appeal to CORC was ever filed, or ever followed up on, it is not that the full scope of administrative remedies was not available to Plaintiff – rather, Plaintiff failed to fully exhaust the administrative remedies available to him." *Houston v. Coveny*, No. 14-CV-6609, 2020 WL 2494439, at \*3 (W.D.N.Y. May 14, 2020); *see Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at \*6 (S.D.N.Y. Aug. 5, 2013) (no "sufficient basis in the record to find that administrative remedies were unavailable" where, among other things, there was "no evidence here that the plaintiff's appeal was actually mailed, intercepted, or ignored" and "DOCCS has no record of any appeal filed with CORC"). [10]

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 83), enter judgment for Defendants, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 3020254

## Footnotes

1    Plaintiff did not file a responsive Rule 56.1 Statement or any papers in opposition to this motion. Local Civil Rule 56.1 requires that the party opposing a motion for summary judgment submit a counterstatement responding to the moving party's statement of material facts, indicating which facts are admitted and which the opposing party contends are in dispute and require a trial. L.R. 56.1(b). Under the Local Rule, "[i]f the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) (citing L.R. 56.1(c)). *Pro se* litigants are not excused from this requirement. *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 344 n.4 (S.D.N.Y. 2011). As Defendants served Plaintiff with the requisite notice pursuant to Local Civil Rule 56.2, (*see* ECF No. 72), I have discretion to consider any properly supported facts in Defendants' Local Civil Rule 56.1 Statement admitted. (The Court will send Plaintiff copies of any unpublished decisions cited in this Opinion and Order.) But granting Plaintiff solicitude, I have considered his deposition testimony, (ECF No. 71-2 ("P's Depo.")), statements in his complaint and amended complaint, both of which are sworn under penalty of perjury pursuant to 28 U.S.C. § 1746, (ECF Nos. 2, 30), and his letter in response to Defendants'

Ruiz v. Link, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 40 of 100

pre-motion letter, (ECF No. 65). *See* 📄 *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (cleaned up).

2    Defendants move for summary judgment on all of Plaintiff's claims on the ground that he failed to exhaust his administrative remedies, and in the alternative for summary judgment only on Plaintiff's deliberate medical indifference claim. (*See* ECF No. 67 at 1.) Because I resolve the motion on the basis of failure to exhaust administrative remedies, I do not describe the specific allegations further.

3    Defendants state in their Rule 56.1 statement that Plaintiff's grievance is dated April 22, 2019, but that is the date on which the grievance was stamped as received by the facility. (*See* ECF No. 71-6.)

4    The form is captioned "Appeal Statement," and below the caption it reads: "If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from your receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." The asterisk leads to a statement about how to request an exception to the time limit. Below the language quoted above are several lines for the inmate to explain why he is appealing, and then signature lines for the inmate and the Grievance Clerk.

5    Plaintiff notes that it is possible he had not previously received the Superintendent's denial because much of the time he was at Sing Sing he was housed in the Office of Mental Health ("OMH") unit after several suicide attempts between June and September of 2019. (P's Depo. at 78:5-19.)

6    Plaintiff responded by letter dated November 8, 2021, but that letter was not received and docketed until November 24, 2021. (*See* ECF No. 65.)

7    The procedure to appeal to CORC under the normal, non-expedited procedures is the same. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5(d)(1)(i).

8    Plaintiff testified as his deposition as follows:

   [Q.] So how do you know where to send the grievance appeal? ...

   A. You can actually get the address from the law library that they provide in the facility. They have all the information of addresses, names, stuff like that.

   Q. And is that what you did? You went to the law library?

   A. Yes, ma'am. I was in the special housing unit at the time, so the law library officer will actually come to you and take your request and then return the request by the next day.

   (P's Depo. at 82:6-19.)

9    Plaintiff's response to the question whether he ever followed up with CORC – that he "tried checking [the appeal], but it had already been months they hadn't responded, so I proceeded with my civil Complaint," (P's Depo. at 81:8-13) – not only contains no information about what he did to check, but suggests at most that he asked about the status of his appeal at or about the same time that he filed this lawsuit.

10    Having so found, I need not and do not address the merits of Plaintiff's medical indifference claim.

**Ruiz v. Link, Not Reported in Fed. Supp. (2022)**

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 41 of 100

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1**  Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (See Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (See id. at 4.) Consequently, he asked Defendant, who was on duty, to

transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (Id. ¶ 9; see also Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (See Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; see also Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; see also IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; see also IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; see also IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2**  As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (See Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (See Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (Id. at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 43 of 100

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to ⚑ Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see* Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," 🔺 Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," Anderson, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (citing Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule

applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion.

*Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the

initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a

"special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross, 136 S. Ct. at 1862; see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross, 136 S. Ct. at 1858–59*. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams, 2016 WL 3729383, at *4 n.2*. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross, 136 S. Ct. at 1859*. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.; see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross, 136 S. Ct. at 1860*.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response,

constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross, 136 S. Ct. at 1859*.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross, 136 S. Ct. at 1859*. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams, 2016 WL 3729383, at *1, *5*. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams, 2016 WL 3729383, at *2*. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross, 136 S. Ct. at 1859*.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested,

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 46 of 100

that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.,* 🚩 *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 🚩 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

## Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See* 🚩 *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2005 WL 2137805

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Johnnie L. PETWAY, Plaintiff,

v.

CITY OF NEW YORK, New York City Police
Department, New York City Fire Department, Emergency
Medical Services Command of the New York City Fire
Department, Police Officer Robert Grau, Police Officer
Ernest Barone (Shield # 25445), Sergeant Anthony
Motolla (Shield # 03687), EMS Lt. Joanne Miller,
James McDermott, Richard Hickey, New York City
Fire Department Fireman John Doe # 1, New York City
Fire Department Fireman John Doe # 2, Defendants.

No. 02-CV-2715 (NGG)(LB).

|

Sept. 2, 2005.

**Attorneys and Law Firms**

Charles H. Ryans, Jr., New York, NY, for Plaintiff.

Mary Theresa O'Flynn, Corporation Counsel of the City of
New York, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

GARAUFIS, J.

 **\*1**  In this action, Johnnie Petway (the "Plaintiff") brings
suit against the defendants (collectively, "Defendants")
pursuant to  42 U.S.C. § 1983 and various state tort laws.
Specifically, the Plaintiff seeks relief for violations of his
Fourth and Fourteenth Amendment rights and for state-law
tort causes of action which include assault, battery, and
false imprisonment. At this time, the court considers the
Defendants' motion for summary judgment, pursuant to Rule
56 of the Federal Rules of Civil Procedure. For the reasons set
forth below, the motion is granted in part and denied in part.

**I. Background**

On January 30, 2001, the Plaintiff was in his living quarters
at 556 Gates Avenue in Brooklyn, New York. (Am. Compl.
at 2.) He smelled smoke, went to investigate, and saw a small
fire in his hallway. (*Id.*) After seeing the fire, the Plaintiff went
downstairs to find a fire extinguisher. (*Id.*) As he descended
the stairway, the lights went off. (*Id.*) The Plaintiff's pets
were still upstairs, and fearing for their safety, he rushed back
towards his apartment. (*Id.*) As he was going up the stairs, the
Plaintiff slipped, fell, and sustained burns on his right hand,
his fingers, his thumb, his left ear, and the left side of his face.
(*Id.*) When he returned upstairs, he saw that the fire had begun
to rage out of control. (*Id.*) The Plaintiff then opened the door
to his residence, and two of his dogs escaped with him down
the stairs. (*Id.* at 3.) Three of his dogs, however, remained
inside as the Plaintiff determined that the fire was too intense
for him to attempt to rescue them. (*Id.*)

Once outside, he yelled for someone to call 911. (*Id.*) The
New York City Fire Department ("FDNY") soon arrived.
(*Id.*) Immediately upon their arrival, the Plaintiff approached
Battalion Chief Richard Hickey. (*Id.*) He explained to Hickey
that his dogs were upstairs and Hickey assured the Plaintiff
that they would rescue the dogs. (*Id.*) The Plaintiff, however,
observed that no efforts were being made to rescue the dogs
or to put out the fire. (Petway Dep. at 63.) As a result, the
Plaintiff again approached Hickey and asked him why no one
was trying to rescue his pets or put water on the fire. (*Id.*)
Hickey told him to "get out of here." (*Id.,* Am. Compl. at 3.)
Believing his question to be reasonable, the Plaintiff asked
Hickey again when he would rescue the pets. (*Id.* at 63-64.)
Hickey told him, "Get the hell out of here." (*Id.,* Am. Compl.
at 3-4.) Soon afterwards, two or three firemen grabbed the
Plaintiff, shoved him, and told him "to get the fuck out of
here." (Am. Compl. at 3-4.) The Plaintiff identified one of
these firemen as Lieutenant James McDermott. (Petway Dep.
at 66.)

A shoving match ensued between the firemen and the Plaintiff
and the Plaintiff refused to be pushed back away from his
home any further. (*Id.* at 70-71.) At that point, according
to the Plaintiff, Lt. McDermott took off his helmet, and
struck the Plaintiff in the head with it. (*Id.* at 71, 72-74, 76.)
Police Officer Ernest Barone then handcuffed the Plaintiff's
wrists behind his back. (*Id.* at 77, 80.) The Plaintiff alleges
that Lt. McDermott punched him once again while he was
handcuffed, specifically that McDermott struck him in the
face with such force that he broke the Plaintiff's nose. (*Id.*

at 77, 80-81, 83.) Shortly afterwards, the handcuffs were removed. (*Id.* at 80.)

**\*2** Two police officers then escorted the Plaintiff across the street. (*Id.* at 86.) The Plaintiff was told there that he would be brought to the hospital. (*Id.* at 86.) The Plaintiff responded that he "wasn't looking to go to the hospital." (*Id.* at 86-87.) The Plaintiff was then informed by EMS Officers, Lieutenant Joanne Miller and Sergeant Anthony Motolla that he had no choice in the matter and that he would be brought to the hospital against his will if necessary. (*Id.* at 87.) The Plaintiff was told that he could go to the hospital "voluntarily and willingly" or that he would be brought to jail and transported to the hospital from there. (*Id.*) The Plaintiff continued to protest. (*Id.*) Lt. Miller explained that they could bring him to the hospital even against his wishes if they determined that his condition was a matter of life and death. (*Id.* at 87.) Sgt. Motolla took the Plaintiff that if he did not cooperate, they would "threaten to tranquilize" him. (*Id.*) The Plaintiff expressed concerns about physical ailments he suffered and medication he took, and the possibility of an allergic reaction to tranquilization. (*Id.*) Ultimately, facing the threat of tranquilization, the Plaintiff agreed and went to the hospital. (*Id.*) He was brought initially to the emergency room. (*Id.* at 94.) Afterwards, he was brought to the burn unit, where he remained for over two weeks. (*Id.* at 95.)

Proceeding pro se and *in forma pauperis,* the Plaintiff filed his initial complaint on April 29, 2002. (April 29, 2002 Compl.) On February 14, 2003, he filed an amended complaint. (Feb. 14, 2003 Am. Compl.) In August of that year, the Plaintiff retained Charles Ryans as his attorney. (Aug. 12, 2003 Notice of Appearance by Charles H. Ryans, Jr.) Discovery was completed on November 8, 2004. (Oct. 18, 2004 Order.) On March 4, 2005, the Defendants moved for summary judgment. (March 4, 2005 Notice of Motion for Summary Judgment.)

## II. Discussion

Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the non-moving party, *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and all reasonable inferences and ambiguities are to be resolved against the non-moving party. *Flanigan v. Gen. Elec. Co.,* 242 F.3d 78, 83 (2nd Cir.2001). Where there are no such genuine issues of fact, and all facts, inferences, and ambiguities are construed in favor of the non-moving party, summary judgment for the moving party is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 119-20 (2d Cir.2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### A. Claims Against NYPD, FDNY, and EMS
**\*3** The Defendants contend, and indeed the Plaintiff does not dispute, that the Plaintiff's claims against the New York City Fire Department ("FDNY"), the New York City Police Department ("NYPD"), and the Emergency Medical Services Command of the New York Fire Department ("EMS") should be dismissed on summary judgment because these three entities are not suable. *See Parker v. DeBuono,* 98 Civ. 5765, 1999 WL 771365 (S.D.N.Y. Sep.28, 1999), at \*2 (N.Y.PD, EMS, and FDNY are not suable entities); *McAllister v. New York City Police Dep't,* 97 Civ. 7420, 1998 WL 314732, at \*1 (S.D.N.Y. June 15, 1998) (N.Y.PD is not a suable entity). "Pursuant to Rule 17(b) of the Federal Rules of Civil Procedure, the capacity [of a government agency] to sue or be sued must be determined by the law of the State in which the district court is held. The State of New York has neither expressly given nor necessarily implied that the NYPD, FDNY or EMS can sue or be sued in their individual capacities." *Parker,* 1999 WL 771365, at \*2 (citations and quotations omitted). [1] Plaintiff's claims against the FDNY, NYPD and EMS are therefore dismissed.

### B. Verbal Harassment and 42 U.S.C. § 1983
The Defendants argue that to the extent the Plaintiff bases his § 1983 claim on verbal harassment by the defendants, it ought to be dismissed because verbal abuse does not amount to a violation of a federally protected right. (Defs. Mem. at 17.) "Generally, mere verbal abuse, and even vile language, does not give rise to a cognizable claim under 42 U.S.C. § 1983." *Beal v. City of New York,* 92 Civ. 0718, 1994 WL 163954, at \*6 (S.D.N.Y. April 22, 1994); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996)

("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Verbal threats do not typically amount to a violation of § 1983 unless they rise to the level of a 'brutal and wanton act of cruelty.' *Beal*, 1994 WL 163954, at *6. In rare cases where a defendant has been held liable under § 1983 for verbal threats, the cases have involved "threats that were grossly disproportionate to the need for action under the circumstances, and that were inspired by malice rather than merely careless or unwise excess of zeal so that [they] amounted to an abuse of official power that shocks the conscience." *Id.* (citations and quotations omitted).

In the present case, the Plaintiff alleges that FDNY personnel told him to get out of the way, to "get the hell out of here," and to "get the fuck out of here." (Petway Dep. at 63-65, Am. Compl. at 3-4.) In addition, the Plaintiff claims that Sgt. Motolla threatened to tranquilize the Plaintiff when he refused to go to the hospital. (Petway Dep. at 88.) Given that at the time a fire was raging and Plaintiff was bloodied and suffering from severe burns over his face, ear, hand, and fingers, *see* Pl. Am. Compl. at 2; Petway Dep. at 85, 88, 95; Miller Dep. at 25, the statements made here by government officials cannot reasonably be considered "brutal or wonton" cruelty. Nor do these statements "shock the conscience" in light of the circumstances and Plaintiff's medical condition. Moreover, the Plaintiff himself states that he has made no claim of verbal harassment. (Pl. Opp. at 20.) Claims of verbal harassment under § 1983 are therefore dismissed. [2]

### C. Officer Grau

**\*4** The Defendants contend, in addition, that claims against Officer Grau ought to be dismissed because the Plaintiff has conceded that Officer Grau did nothing to him. (Defs. Mem. at 5.) The Plaintiff made no response to this contention. At his deposition, the Plaintiff acknowledged that there was "nothing between [him] and Mr. Grau" and that Officer Grau had done "absolutely nothing" to him as far as he knew. (Petway Dep. at 112-13.) A plaintiff must at least allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir.1994); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (a concrete and particularized injury that is traceable to challenged action of the defendant is required for a plaintiff to have standing to

bring a claim). Here, since the Plaintiff does not allege that Officer Grau caused him any injury, the Plaintiff's claims against Officer Grau are dismissed.

### D. Unidentified Officers

#### i. Rule 4(m) of the Federal Rules of Civil Procedure

The Defendants argue that the claims of excessive force against two unnamed officials should be dismissed because the Plaintiff has failed to identify these parties in the nearly three years that have passed since the start of this litigation. (Defs. Mem. at 8.) In response, the Plaintiff argues that the unknown identities of these two officials merely raises an issue of fact that should be left for the jury to decide. (Pl. Opp. at 5.) In addition, the Plaintiff requests that the court order the Defendants to produce documents that the Plaintiff has previously sought so that he might better be able to identify the unnamed individuals. (*Id.* at 5-6.) The Defendants further argue that even if the claims are not dismissed for lack of identification, they should nonetheless be dismissed because the officers' actions were reasonable under the circumstances. (*Id.*) Because the court determines that the claims should be dismissed due to untimely service, it need not address the issue of the reasonableness of the officials' acts.

As a general rule, federal courts disfavor the use of unidentified "John Doe" defendants, but recognize that in certain situations a plaintiff may not be in a position to know the actual identity of a defendant and therefore should be permitted to proceed against an unidentified party. *Covington v. Warden of C-95*, 93 CV 1958, 1996 WL 75211, at *4 (E.D.N.Y. Feb.8, 1996). Nonetheless, a plaintiff's obligation to serve a defendant in a timely fashion is not waived merely because a plaintiff has filed a complaint against an unnamed party. *Cammick v. City of New York*, No. 96 Civ. 4374, 1998 WL 796452, at *1 (S.D.N.Y. Nov.17, 1998). The Federal Rules of Civil Procedure direct that a party serve a defendant within 120 days of filing the complaint. Fed.R.Civ.P. 4(m). In the event that a plaintiff fails to serve process upon a defendant within that time period, the court "shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." *Id.*

**\*5** Here, the Plaintiff originally filed his complaint on April 29, 2002. (*See* Apr. 29, 2002 Compl.) In the more than three years that have passed since then, he has not identified the

John Doe defendants and has therefore not served process upon them. This failure is not the result of lack of opportunity. Magistrate Judge Bloom extended the discovery deadline on several occasions to accommodate requests made by the Plaintiff. (*See* April 9, 2004 Order; Aug. 3, 2004 Order; Sept. 29, 2004 Order; October 18, 2004 Order.) The Plaintiff has had over three years, far more than the typical 120 day time period, to identify and serve the John Doe defendants, and the court is under no obligation to extend the deadline indefinitely. *See Thomas v. Keane,* No. 99 Civ. 4302, 2001 WL 410095, at *1, *5 (S.D.N.Y. April 23, 2001) (dismissing claim under Rule 4(m) where the pro se plaintiff failed to serve John Doe defendants within roughly two years of filing complaint); 🚩 *Cammick,* 1998 WL 796452, at *1 (dismissing a claim under Rule 4(m) where the plaintiff failed to serve John Doe defendants within two years and five months of filing complaint); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *5 (N.D.N.Y. Oct. 1, 1998) (dismissing a claim under 4(m) where the pro se plaintiff failed to serve John Doe defendants within a year of filing his complaint). The court therefore dismisses without prejudice the claims against the unidentified defendants for lack of timely service.

### *ii. Plaintiff's Motion to Compel*

In an effort to discover the identities of the John Doe defendants, the Plaintiff urges the court to compel the Defendants to respond to three previously made document requests. (Pl. Opp. at 6.) The court denies this motion. The Plaintiff's first document request was made orally, and the Defendants requested that it be put in writing. (McDermott Dep. at 13-14.) The Plaintiff did not object to the Defendants' request, nor has the Plaintiff provided evidence that he put this request in writing. (Defs. Reply at 5.) The Plaintiff's second document request was answered by the Defendants. (Defs. Sept. 13, 2004 letter.) With respect to the third document request, Magistrate Judge Bloom ordered that it need not be answered due to the request's untimeliness. (Magistrate Judge Bloom Oct. 18, 2004 Order.)

Although the Plaintiff has been given previous extensions and has been provided with ample opportunity to identify the John Doe defendants, he again seeks to extend the deadline for discovery. The court declines to do so. *See* 🚩 *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (denying further discovery when the party opposing summary judgment had a "fully adequate opportunity for discovery"); *see also* 🚩 *Burlington Coat*

*Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 927 (2d Cir.1985) (denying plaintiff's request to reopen discovery when plaintiff had "ample time in which to pursue the discovery that it now claims is essential"). Here, the Plaintiff himself failed to make one request in writing, made one untimely request, and has already received an answer to a third request. He has been given adequate time to conduct discovery and is not entitled to further extensions. Consequently, the court refuses to compel discovery of these documents.

### *E. Adequacy of Service Upon Lieutenant Miller*

**\*6** The Defendants also contend that claims against Lt. Miller should be dismissed on the grounds of failure to serve process. (Defs. March 4, 2005 Statement at 2.) The Plaintiff responds that due to the fact that the Plaintiff began this proceeding pro se and *in forma pauperis,* service upon Lt. Miller's should effectively be excused. (Pl. Resp. at 1.)

As explained above, a cause of action is subject to dismissal if a plaintiff has failed to serve a defendant with a summons and complaint within 120 days after filing the complaint. Fed.R.Civ.P. 4(m). While pro se litigants should be afforded a degree of latitude, they are nevertheless generally required "to inform themselves regarding procedural rules and to comply with them." 🚩 *LoSacco v. City of Middleton,* 71 F.3d 88, 92 (2d Cir.1995). Where a pro se plaintiff is confused about requirements detailed in Rule 4, the court may extend the 120-day deadline. *Herrera v. New York Tel. Co.,* 93 Civ. 2599, 1995 WL 405842, at *1 (S.D.N.Y. July 10, 1995). Nevertheless, courts may dismiss cases for failure of service after an appropriate amount of time. *See Thomas,* 2001 WL 410095, at *1, *5 (dismissing pro se claim about two years after filing complaint); *Waldo,* 1998 WL 713809, at *5 (dismissing pro se claim within a year of filing complaint).

Here, three years have passed since the Plaintiff filed his initial complaint. The failure to serve is not due to confusion concerning the service of process rule. Indeed, the Plaintiff properly served other defendants, and provided proof of such service to the court. (*See, e.g.,* Aug. 8, 2002 Summons; March 25, 2003 Summons.) Furthermore, although the Plaintiff initially brought his case pro se, he has had the guidance of retained counsel for almost two years. (*See* Aug. 12, 2003 Notice of Appearance.) In that almost two-year period, however, there has been no showing that Lt. Miller was ever properly served. *Cf. Herrera,* 1995 WL 405842, at *1 (refusing to dismiss case despite untimely service because the

litigant began the case pro se but later retained counsel who promptly remedied the failure of service). Dismissal of claims against Lt. Miller for lack of service is therefore appropriate. [3]

### F. 🏷 *42 U.S.C. § 1983 Claims Against the City of New York*

The Defendants further maintain that the Plaintiff's 🏷 § 1983 claims against the City of New York should be dismissed because the Plaintiff has failed to demonstrate that a municipal policy was the cause of the alleged violations. [4] (Defs. Mem. at 18.) Title fourty-two U.S.C. § 1983 provides a cause of action against any person who, under color of state law, violates rights or privileges established under the Constitution or law of the United States. Local governments are considered a "person" for 🏷 § 1983 purposes and can therefore be sued under the statute. 🏷 *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a local government is not liable under 🏷 § 1983 for injury which is merely the result of a government employee's conduct, but rather only when the injury at issue is the result of an adopted municipal policy or custom. 🏷 *Monell,* 436 U.S. at 690; *see also* 🏷 *Coon v. Town of Springfield,* 404 F.3d 683, 686 (2d Cir.2005).

#### i. Failure to Train

**\*7** In his amended complaint, the Plaintiff alleges that New York City should be held liable for its failure to train its "uniformed members" properly. (Am. Compl. at 6.) The Supreme Court has held that a municipality may be held liable for failure to train its employees where it acts with "'deliberate indifference' to the rights of persons with whom the police come into contact." 🏷 *City of Canton,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The Second Circuit elaborates:

*City of Canton* requires that plaintiffs establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is "closely related to the ultimate injury," such that it "actually caused" the constitutional deprivation. Thus, the Supreme Court emphasized in *City of Canton* that plaintiffs must establish that "the officer's shortcomings ... resulted from ... a faulty training program" rather than from the negligent

administration of a sound program or other unrelated circumstances.

🏷 *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d. Cir.2004) (citing 🏷 *Canton,* 489 U.S. at 390-91). Here, even when specifically called upon to support his 🏷 § 1983 claim against the city, the Plaintiff has provided no evidence of a specific deficiency in New York City's training program or the deficiency's close relationship to his injury. The court therefore dismisses the Plaintiff's 🏷 § 1983 claim concerning the City's alleged failure to properly train its employees.

#### ii. Failure to Supervise

In his amended complaint, the Plaintiff also argues that New York City failed to properly supervise its "uniformed members." (Pl. Am. Compl. at 6.) To survive summary judgment, a claim for failure to supervise must also be supported by evidence of a municipal policy or custom which caused the injury. 🏷 *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). In a failure to supervise case, a plaintiff must typically establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." 🏷 *Amnesty America,* 361 F.3d at 128 (citations and quotations omitted).

Here, the Plaintiff has provided no evidence that a policymaking official had notice of a potentially serious problem of constitutional conduct, that the need for corrective supervision was obvious, or that any inaction was due to deliberate indifference. In short, the Plaintiff has provided no evidence to prove a required element for a valid 🏷 § 1983 claim against the City of New York. Consequently, the court must dismiss the Plaintiff's claim alleging New York City's failure to supervise.

### G. Claims Against Lt. McDermott

#### i. Identification of Lieutenant McDermott

**\*8** The Defendants assert that the Plaintiff's claims against Lt. McDermott must be dismissed because there is doubt as to

whether the Plaintiff has properly identified him. (Defs. Mem. at 10.) Specifically, they argue that there are inconsistencies in the record which suggest that the Plaintiff may have misidentified Lt. McDermott as the person who allegedly struck the Plaintiff with his fist and with his helmet. (*Id.*) The Plaintiff, however, contends that he sufficiently identified Lt. McDermott, and that the claim against him should therefore not be dismissed on summary judgment. (Pl. Opp. at 2-4.)

For summary judgment purposes, the court resolves all ambiguities and draws all inferences in favor of the non-moving party. *Schwabenbauer v. Board of Education,* 667 F.2d 305, 313 (2d Cir.1981). Here, the Plaintiff alleges that he was struck twice. (Petway Dep. at 71, 82-83.) He believed that his assailant was "approximately" five feet ten inches tall and that he was no taller than six feet. (*Id.* at 66.) A witness, who testified that a fireman struck the Plaintiff, did not remember distinctly how tall the person was who struck the Plaintiff, but indicated that he was about six feet ten inches tall while wearing a helmet. (Lyons Dep. at 34-36.) Lt. McDermott is five feet seven and a half inches tall. (McDermott Aff. at 1.) Thus, because the Plaintiff and a witness believe the alleged tortfeasor to be taller than Lt. McDermott actually is, the Defendants urge the court to dismiss the case against Lt. McDermott. The court declines to do so.

The court must draw all inferences in the Plaintiff's favor, and it is reasonable to infer that the Plaintiff and witness could have misjudged Lt. McDermott's height. First, the Plaintiff believed his tortfeasor to be only two and a half inches taller than Lt. McDermott actually is, a relatively minimal and easily mistakable difference. Second, the alleged tortfeasor was wearing his helmet and, presumably, his boots, and these articles of clothing would have made him appear taller than he was. Third, the Plaintiff and witness were not in a situation where they had the opportunity to carefully observe the alleged's tortfeasor's exact measurements. Thus, viewing the facts in the light most favorable to the Plaintiff, the court denies the Defendants' motion to dismiss the cause of action against Lt. McDermott on account of the inaccurate assessments of Lt. McDermott's height.

### ii. Excessive Force

As an alternative argument, the Defendants urge that even if the Plaintiff sufficiently identified Lt. McDermott, the Lieutenant's acts were reasonable in light of the circumstances and therefore did not violate Plaintiff's constitutional rights.[5] (Defs. Mem. at 11.) The Plaintiff counters that Lt. McDermott

did not act reasonably, and asserts additionally that the reasonableness of McDermott's acts should in any event be resolved by a trier of fact. (Pl.Opp.8-12.)

The Fourth Amendment protects against "unreasonable" seizures. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "The 'reasonableness' of a particular seizure depends not only on *when* it was made, but also on *how* it is carried out." *Id.* (emphasis in original). Thus a plaintiff can "prevail on his excessive force claim if he is able to show that [a government officer] used more force than was necessary to subdue him."[6] *Curry v. City of Syracuse,* 316 F.3d 324, 332 (2d Cir.2003). Determining whether a particular seizure was reasonable is a fact-intensive process, requiring careful consideration of the facts and circumstances of the particular case, including the severity of the crime and the dangerousness of the suspect. *Graham,* 490 U.S. at 395. The officer's actions also must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 395; *see also Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citing *Graham* ). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 397. In an excessive force case, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397; *see also Saucier,* 533 U.S. at 204-5 (citing *Graham* ).

 **\*9** The facts of this case, viewed in the light most favorable to the non-moving party, unfold as follows. The Plaintiff escaped from a burning building, and emerged injured and very concerned about his three dogs that remained trapped inside. (Am. Compl. at 2-3.) Firefighters eventually arrived, and the Plaintiff approached Chief Hickey to ask about efforts being made to save his dogs. (*Id.* at 7) Although the Plaintiff was assured his dogs would be rescued, he asked Chief Hickey a second time after no efforts were made to do so. (Am. Compl. at 3; Petway Dep. at 63-64.) Chief Hickey then verbally reprimanded the Plaintiff to move away and two firemen began shoving him. (*Id.* at 64-65.) As the Plaintiff protested being shoved, he was again verbally reprimanded, at which point Lt. McDermott took off his helmet and struck the Plaintiff in the head with it. (*Id.* at 72-74.) The Plaintiff's

hands were still at his side when he was struck. (*Id.* at 74.) Officer Barone then handcuffed the Plaintiff's wrists tightly behind his back. (*Id.* at 80.) While handcuffed, Lt. McDermott struck the Plaintiff again, this time in the face and with such force that it may have broken his nose. (*Id.* at 83.)

When one considers this scenario from an on-the-scene perspective, Lt. McDermott's use of force was clearly excessive. Lt. McDermott allegedly struck the Plaintiff in his head even though the Plaintiff's arms were at his sides and seemingly posed no physical threat. Plaintiff's wrists were then securely handcuffed behind his back. Thus restrained, the Plaintiff appeared to be of no danger to himself or to others. Nor is there any indication that the Plaintiff was trying to escape. Nevertheless, while the Plaintiff was restrained and in this vulnerable position, Lt. McDermott allegedly punched him in the face so forcefully that it broke the Plaintiff's nose. Viewed in this light, the facts indicate the use of unreasonable force in violation of the Plaintiff's Fourth Amendment rights, and thus Plaintiff's excessive force claim will not be dismissed on summary judgment.

### iii. Qualified Immunity

The Defendants argue, in addition, that Lt. McDermott should be entitled to qualified immunity since he reasonably believed his actions to be lawful. (Defs. Memo. at 12-13.) They maintain that a reasonable officer "could have believed that exerting some force to remove the plaintiff from the scene was an appropriate response in these circumstances." (Defs. Mem. at 13.) Where a defendant claims qualified immunity, and moves for summary judgment on this ground, the court engages in a two step analysis. *Saucier,* 533 U.S. at 201. The initial inquiry is whether, viewed in the light most favorable to the injured party, the facts alleged demonstrate that the officer's conduct violated a constitutional right. *Id.* If there has been no constitutional violation made out on the alleged facts, the inquiry ends. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* If a right has not been clearly established, then an official, acting unconstitutionally, is not on notice that his conduct is unlawful. *Id.* at 202. In the absence of such notice, summary judgment based on qualified immunity is appropriate. *Id.*

**\*10** As described above, the facts alleged indicate that Lt. McDermott used excessive force and thus violated the Fourth Amendment. The court, therefore, proceeds to the second step of the *Saucier* analysis and asks whether this violated right was clearly established. There can be no doubt that the right to be free from excessive use of force was clearly established at the time of the incident. *See, e.g., Graham,* 490 U.S. at 395 (explaining the standard to be used to determine whether a government official used excessive force). Striking the Plaintiff while he was handcuffed, restrained, and unthreatening was unlawful conduct given the circumstances, and that it was excessive "would [have been] clear to a reasonable officer." *Saucier,* 533 U.S. at 202. Consequently, Lt. McDermott does not have qualified immunity with regard to his alleged striking of the Plaintiff.

### iv. Participation of Other Officials

The Defendants urge the court, in addition, to dismiss on summary judgment any claims against Chief Hickey, Officer Barone, and Sgt. Motolla with regard to this alleged striking. Specifically, the Defendants argue that the Plaintiff fails to allege any participation of these three officials, and that it would therefore be appropriate to dismiss claims against them.

A plaintiff must, at minimum, allege that he suffered an injury by a defendant for his claim against that defendant to survive summary judgment. *Wachtler v. County of Herkimer,* 35 F.3d 77, 82 (2d Cir.1994); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Here, the Plaintiff has not alleged that Chief Hickey, Officer Barone, or Sgt. Motolla participated in Lt. McDermott's alleged use of excessive force. Therefore, the claims against Chief Hickey, Officer Barone, and Sgt. Motolla are dismissed.

### H. False Arrest Claims

The Defendants argue that the court should dismiss the Plaintiff's false arrest claims on the grounds that the Plaintiff was never formally arrested.[7] (Defs. Memo. at 15.) The Plaintiff, however, argues that a person need not be actually arrested to state a valid claim of false arrest. (Pl. Opp. at 18.) Specifically, he argues that he was placed in a position where a reasonable person would not have felt free to leave and that this deprivation of freedom was sufficient to state a false arrest claim. (*Id.*)

A cause of action for false arrest can be brought either as a violation of state tort law or as a violation of § 1983 based on an unreasonable seizure under the Fourth Amendment. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003). For neither cause of action is formal arrest a necessity. For the state law tort claim,[8] a plaintiff must show that the defendant intended to confine the plaintiff, the plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not otherwise privileged. *Id.* Significantly, "[t]here is no requirement under New York law that an arrest be in any sense formal." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991); *see also Hicks,* 508 N.Y.S.2d at 166, 500 N.E.2d 861 (1986) ("Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest...."); *People v. Chestnut,* 51 N.Y.2d 14, 431 N.Y.S.2d 485, 489, 409 N.E.2d 958 (1980) ( "[W]hen the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur whether or not the person is eventually transported to the police station and charged with a crime."). To determine whether a person has been arrested, the court considers whether a reasonable man, innocent of any crime, would have thought he was arrested. *People v. Hicks,* 508 N.Y.S.2d at 166, 500 N.E.2d 861 (citing *People v. Yukl,* 25 N.Y.2d 585, 589, 307 N.Y.S.2d 857, 256 N.E.2d 172 (1969)).

**\*11** Similarly, a plaintiff need not show that there was a formal arrest to state a valid § 1983 claim. Arrest is the "quintessential seizure of the person." *Posr,* 944 F.2d at 97 (citing *California v. Hodari D.,* 499 U.S. 544, 551-57 (1980)). However, a person need not be formally arrested to be seized in violation of the Fourth Amendment. *Id.* at 97. Under constitutional standards, a person is seized "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 99 (finding that even without a formal arrest, a plaintiff was sufficiently "arrested" and "seized" for false arrest and § 1983 purposes when an officer "slammed" the plaintiff against a wall); *Green v. City of New York,* No. 01 Civ.1996, 2004 U.S. Dist. LEXIS 5, at *32-33 (S.D.N.Y. Jan. 5, 2004) ("There is no doubt that Mr. Green's transport to the hospital against his wishes was a 'seizure' within the meaning of the Fourth Amendment.").

In this case, although the Plaintiff was never formally arrested, his wrists were tightly handcuffed behind his back and he was struck in the head and face. (Petway Dep. at 79-80, 83, 112.) Furthermore, the Plaintiff was informed that he would be transported to the hospital against his will, perhaps even tranquilized. (*Id.*) Defendants point out that the Plaintiff was only handcuffed for several minutes, but a seizure may be effected for the purposes of the Fourth Amendment even when an officer "briefly detains an individual and restrains that person's right to walk away." *United States v. Moreno,* 897 F.2d 26, 30 (2d Cir.1990). A reasonable person, in the Plaintiff's situation, could reasonably have believed that he was not free to leave. Thus, the Plaintiff's false arrest claims will not be dismissed merely because the Plaintiff was not formally arrested.

*I. Right to Refuse Medical Treatment*

The Plaintiff has argued that he was denied the right to refuse medical treatment. The Defendants contend that this claim should be dismissed because the Plaintiff consented to go to the hospital. (Defs. Memo. at 15.) They argue, in addition, that even if he did not go voluntarily, the claim should be dismissed because the EMS could have transported him to the hospital without his consent. (*Id.* at 15-16.) The Plaintiff responds that his injuries were not so severe as to justify taking him to the hospital without his consent, and that he did not submit voluntarily to hospitalization, but rather was coerced to do so. (Pl. Opp. at 19.) Because the court finds that the EMS could have transported the Plaintiff without his consent, the court need not decide whether the Plaintiff consented to this transportation.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Supreme Court has interpreted this Amendment to mean that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment...." *Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). The right to refuse medical treatment "does not rest upon 'a general and abstract right to hasten death, but on well-established, traditional rights to bodily integrity and freedom from unwanted touching.' ", *Blouin v. Spitzer,* 356 F.3d 348, 360 (2d Cir.2004) (citing *Vacco v. Quill,* 521 U.S. 793, 807, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). This right is "squarely grounded in the act of consent: Everyone, regardless of physical condition,

is entitled, *if competent,* to refuse unwanted lifesaving medical treatment." *Blouin,* 356 F.3d at 360 (citations and quotation marks omitted) (emphasis in original).

**\*12** However, the state has an interest in protecting and preserving the lives of its citizens. *Green,* 2004 U.S. Dist. LEXIS 5, at \*34. Therefore, when an officer reasonably concludes that an individual cannot make a competent judgment, or that the official would very likely expose himself to potential liability if he does not transport the individual to a hospital, that officer may force the injured individual to receive medical treatment even against that individual's will. *See Green,* 2004 U.S. Dist. LEXIS 5, at \*36-37; *see also* *Vazquez v. Marciano,* 169 F.Supp.2d 248, 253 (S.D.N.Y.2001).

In *Green v. City of New York,* for example, a woman called for emergency medical assistance because she believed that her husband could not breathe. *Green,* 2004 U.S. Dist. LEXIS 5, at \*35. At least one of the medical officers, after his arrival on the scene, believed that the husband was dying and that he would have to go to the hospital to survive. *Id.* The husband, who could communicate only through blinking and through a computer, expressed to his wife that he did not wish to go to the hospital, and she communicated this message to the medical officers; however, the technicians transferred him to the hospital in spite of his wishes. *Id.* at \*3, \*15-\*16. The court found that it was reasonable for the emergency medical officials to transport the plaintiff to the hospital against his will, and the court therefore refused to impose liability on the officials for their conduct. Specifically, the court reasoned that "the crisis atmosphere would have caused the officers to conclude that this was not a setting in which [the plaintiff] could make an informed and competent decision regarding his treatment," and that the officers would have exposed themselves to potential liability had they not transported the plaintiff to the hospital given the "extreme danger" of his medical condition. *Id.* at \*36-\*38.

The court in *Vazquez v. Marciano* came to a similar conclusion. In that case, the plaintiff had been in a serious car accident. *Vazquez v. Marciano,* 169 F.Supp.2d 248, 250 (S.D.N.Y.2001). Plaintiff's car hit a tree, causing him to momentarily black out and rendering his passenger unconscious and trapped inside the vehicle. *Id.* at 250, 253. When officers arrived, the plaintiff tried to evade them. *Id.* at 250. Once apprehended, the plaintiff was taken to

the hospital against his express wishes. *Id.* at 250-51. When the plaintiff sued the officer for forcing him to undergo medical treatment, the court determined that the officers were entitled to qualified immunity because the officers had acted in an objectively reasonable manner. *Id.* at 253. Specifically, the court reasoned that the plaintiff could not have made a rational decision because he was inebriated and because of the crisis atmosphere. *See id.* Furthermore, it was reasonable for the officer to transport the plaintiff to the hospital because, given the plaintiff's injuries, the officer would have been exposed to liability had he not transported the plaintiff. *Id.*

**\*13** In the present case, interpreted in the light most favorable to the Plaintiff, the facts suggest that a conclusion similar to that in *Green* and *Vazquez* is appropriate. A fire "was raging out of control" at the Plaintiff's residence. (Pl. Am. Comp. at 2.) In his escape from the fire, the Plaintiff burned the left side of his face, his left ear, his right hand, and four of his fingers. (*Id.* at 2.) Later, the Plaintiff was struck, allegedly so hard that his nose was broken and there was blood "all over" the Plaintiff's pants and shirt. (Petway Dep. at 83-85.) The Plaintiff then received medical attention from Lt. Miller, an EMS official, who testified that she believed that if the Plaintiff was not treated at a hospital, he could have lost a limb or even his life. (Miller Dep. at 25.) The Plaintiff repeatedly refused to go to the hospital and was repeatedly told that he could and would be taken against his will if it was determined that his life was at risk. (*Id.* at 86-88.) Eventually, he agreed to go to the hospital. (*Id.* at 5.) He ultimately was treated at the hospital's burn unit for over two weeks. (Pl. Dep. at 95.)

In this case, as in the *Green* and *Vazquez* cases, there was an emergency "crisis" situation. Notably, while the plaintiff in *Green* was hospitalized for five days, the Plaintiff here was injured to the extent that he needed over two weeks hospitalization. Similarly, the officers in this case, like those in *Green* and *Vazquez,* could reasonably have believed that they would have exposed themselves to legal liability if they had permitted the Plaintiff to refuse medical treatment. A person's right to refuse medical treatment must be balanced with the state's interest in preserving the lives and safety of its citizens. Imposing liability in such a situation as this would impermissibly discourage medical professionals from performing their life-saving functions. *See Green,* 2004 U.S. Dist. LEXIS 5, at \*36-37 ("The state also has an interest in protecting its employees from liability for decisions such as

the one in this case; imposing liability in this circumstance could cause future decision makers to err on the side of leaving critically ill patients without professional medical assistance.")

It should further be noted that the Plaintiff has failed to provide the court with any case law in support of this Fourteenth Amendment claim. He has provided no case in which a seriously injured person, forced to accept medical treatment under crisis conditions, collected damages arising from the Fourteenth Amendment right to refuse medical treatment. Therefore, given the crisis situation, the Plaintiff's serious injuries, the lack of supporting relevant case law, and the underlying policy considerations, the court finds that the Defendants did not violate the Plaintiff's Fourteenth Amendment right to refuse medical treatment.

Notwithstanding that the Plaintiff's Fourteenth Amendment right was violated, the Defendants are nonetheless immune from liability here. As noted above, the court engages in a two-step analysis when it seeks to determine whether a municipal employee should be protected by qualified immunity against a 🚩 § 1983 claim. 🚩 *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In the first step, the court determines whether a constitutional right was violated. *Id.* In the second step, the court determines whether that right was clearly established, considering the particular circumstances of the case. *Id.* Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." 🚩 *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also* 🚩 *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004).

 **\*14** Assuming, *arguendo,* that the Plaintiff's Fourteenth Amendment rights were violated, it cannot be said that the Defendants acted in an unreasonable manner when they forced him to accept medical treatment, especially considering the fact that the Plaintiff was so severely burned that he required over two weeks of hospitalization, that one EMS official believed that his life was at risk, and that the

Plaintiff's decision-making process may have been impaired by the crisis atmosphere. Given these circumstances, Lt. Miller and Sgt. Motolla acted in an objectively reasonable fashion. *See* 🚩 *Luna,* 356 F.3d at 490 ("[E]ven assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully.") The Plaintiff's right to refuse medical treatment under these conditions was therefore not clearly established. Even if the Defendants did violate his Fourteenth Amendment rights, they are nevertheless protected under the doctrine of qualified immunity.

### IV. Conclusion

For the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motion for summary judgment is GRANTED with respect to the following: claims against NYPD, FDNY, EMS; claims against Officer Grau; claims against Lt. Miller and the two unidentified firemen; 🚩 § 1983 claims for verbal abuse; 🚩 § 1983 claims against the City of New York; claims against Chief Hickey, Officer Barone, and Sgt. Motolla concerning the alleged striking of the Plaintiff by Lt. McDermott; and the Plaintiff's claim of a Fourteenth Amendment violation of the right to refuse medical treatment. The aforementioned claims are dismissed. Defendants' motion for summary judgment is DENIED with respect to the following: claims against Lt. McDermott for excessive use of force and Plaintiff's false arrest claims. In addition, Plaintiff's motion to compel discovery is denied.

The parties are instructed to contact Magistrate Judge Bloom to prepare a pre-trial order.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2005 WL 2137805

---

### Footnotes

1    It should be noted that the EMS merged with the FDNY in 1996. New York City Fire Department, *History and Heritage / EMS,* at *http:// nyc.gov/html/fdny/html/history/ems.shtml; see also Giuliani's Budget Plan: the*

*Overview,* N.Y. TIMES, May 10, 1996, at A1. As part of the FDNY, which is not a suable entity, the EMS remains not suable.

2    It should also be noted that the Defendants, in their motion papers, argue that their failure to save the Plaintiff's dogs did not violate the Plaintiff's constitutional rights. (Defs.Mem.6.) However, the Plaintiff's complaint never alleged that such failure amounted to a constitutional violation, and indeed the Plaintiff himself explained that this was not material to his constitutional claims against the Defendants. (Pl. Opp. at 2.) As these claims were never raised, they are not considered among the claims maintained by the Plaintiff.

3    It should be noted that the Plaintiff incorrectly argues that the Defendant bears the burden of proving Lt. Miller was never served. (Pl. Resp. at 1.) Because the Defendant has validly challenged the service of process, the burden shifts to the Plaintiff to prove that proper service was performed. *Johnson v. Quik Park Columbia Garage Corp.,* No. 93 Civ. 5276, 1995 WL 258153 at *1 n. 2 (S.D.N.Y. May 2, 1995).

4    The Plaintiff does not directly address this argument in his opposition brief, but does contend that his *§ 1983* claims should not be dismissed even in the event that city officers may have qualified immunity. (Pl. Opp. at 21-22.) Additionally, he argues that the action should not be dropped because there are disputed facts which a jury ought to resolve at trial. (*Id.* at 22.)

5    They also argue that the broken nose may not have been caused by Lt. McDermott. Specifically, they conjecture that the Plaintiff may have broken his nose when he fell on the stairs of his building. (Defs. Mem. at 11.) They note, in addition, that the Plaintiff was not treated for a broken nose while at the hospital. (Defs. Mem. at 11-12.) The Plaintiff testified, however, that Lt. McDermott struck his nose so hard that the Plaintiff's nose began to bleed, causing blood to pour "all over" his pants and shirt. (Petway Dep. at 85.) In addition, a hospital report two days after the event indicated that the Plaintiff had "bilateral comminuted nasal bone fractures." (*See* Feb. 1, 2001 New York Presbyterian Hospital Diagnosis at 1.) In light of this testimony and information, the court cannot find that there is no disputed issue of fact as to whether the Plaintiff's nose was broken. In any event, even if the Plaintiff's nose was not broken, Lt. McDermott's alleged striking of the Plaintiff, while the Plaintiff was handcuffed, restrained, and unthreatening, would nevertheless constitute an unreasonable and excessive use of force.

6    Although the Fourth Amendment was primarily directed at restraining unreasonable searches and seizures conducted by the police, the Amendment also imposes restraints upon civil authorities, including firefighters. *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) ("[T]he [Supreme] Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'-that is, 'upon the activities of sovereign authority.' Accordingly, we have held the Fourth Amendment applicable to the activities of civil as well as criminal authorities ....") (citations omitted); *see also Michigan v. Clifford,* 464 U.S. 287, 293, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984) (applying Fourth Amendment restraints to firefighters).

7    It is unclear whether the Defendants seek a dismissal of false arrest claims brought under state tort law or of false arrest claims brought under *§ 1983* for a violation of the Plaintiff's Fourth Amendment rights. In any event, dismissal is justified in neither situation.

8    Under the doctrine of supplemental jurisdiction, a federal district court can hear a state tort law false arrest claim. *See e.g., Rodriguez v. Phillips,* 66 F.3d 470, 482 (2d Cir.1995). The court may preside over a pendent state-law claim which shares the same set of facts as a claim over which the court has original jurisdiction. *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704-05 (2d Cir.2000) (explaining

that state-law false arrest claim must share with the federal-law claim "a common nucleus of operative fact" for the court to hear the state-law claim by means of supplemental jurisdiction)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 410095
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sutcliffe THOMAS, Plaintiff,

v.

John P. KEANE, et al., Defendants.

No. 99 Civ. 4302 DC.
|
April 23, 2001.

**Attorneys and Law Firms**

Sutcliffe Thomas, Clinton Correctional Facility, Dannemora, New York, Plaintiff, pro se.

Eliot L. Spitzer, Attorney General of the State of New York, By: Susan M. Barbour, Assistant Attorney General, New York, New York, for Defendant Crawford.

Fager & Amsler, By: George V. Pappachen, Jr., New York, New York, for Defendant Roth.

Geisler & Gabriele, LLP, By: Lindsey A. Davison, Garden City, New York, for Defendant Buhta.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, By: Laura B. Jordan, White Plains, New York, for Defendant St. Agnes Hospital.

*MEMORANDUM DECISION*

CHIN, J.

**\*1** In this case, *pro se* plaintiff Sutcliffe Thomas claims that the defendants, Sgt. Melvin Crawford, Kalyani Buhta, M.D., Aaron Roth, M.D., and St. Agnes Hospital ("St.Agnes") are responsible for the injuries plaintiff sustained when he was stabbed by another inmate while incarcerated at Sing Sing Correctional Facility ("Sing Sing"). Specifically, plaintiff alleges that his constitutional rights under the Eighth and Fourteenth Amendments were violated because Crawford failed to protect him from the attack. In addition, plaintiff contends that Roth and Buhta failed to provide adequate medical care while treating him at St. Agnes. Plaintiff brings this action for damages pursuant to 42 U.S.C. § 1983.

Defendants move for summary judgment under Fed.R.Civ.P. 56 on the following grounds: plaintiff failed to exhaust administrative remedies; the Court lacks jurisdiction under the Eleventh Amendment; plaintiff fails to state a claim under the Eighth Amendment; qualified immunity protects Crawford; improper service of process; and the statute of limitations. For the reasons set forth below, the motions are granted.

*BACKGROUND*

A. *Facts*

Defendant Crawford is employed as a sergeant at Sing Sing. Crawford was working there on April 13, 1996 and was assigned to Housing Block B ("HBB"). (Crawford Aff. ¶¶ 3, 7). A corrections officer informed Crawford that an inmate had reported an assault and threats of retaliation between Muslim and Dominican inmates in HBB. (Am. Compl. Exs. B & C; Crawford Aff. ¶ 15). Crawford questioned several officers as well as the Muslim Imam, but no one knew of anything to substantiate the rumors. The prison officials did not know which inmate had been beaten or which inmates had committed the assault. (Crawford Aff. ¶ 16).

Later that day, Crawford responded to an emergency alarm in HBB where there was a disturbance among inmates. (Crawford Aff. ¶¶ 27–29). Crawford followed standard procedure by waiting with the other officers outside a locked gate until receiving notice that the area was safe to enter. (Crawford Aff. ¶¶ 32–38). During the altercation, plaintiff, who is Muslim and, at the time was an inmate at Sing Sing, was stabbed by another inmate. (Am.Compl.¶¶ 2, 9).

Plaintiff underwent surgery at St. Agnes for the abdominal stab wound. Defendant Roth performed surgery and defendant Buhta assisted. (Am.Comp.Ex. E). After a prolonged hospital stay during which he complained of abdominal pain, plaintiff was released. Shortly thereafter, plaintiff returned to the emergency room suffering from "severe cramping pain" and underwent a second surgery on May 15, 1996. (Am.Comp.Ex. E).

B. *Procedural History*

Plaintiff brought this action by submitting a complaint to the Court's *Pro Se* Office on April 9, 1999, naming seven individual defendants, Crawford, Buhta, Roth, Corrections Officer Caballero, John P. Keane, Brant L. Kehn, and Thomas

Healey, as well as four John Doe defendants and St. Agnes. Caballero died on October 9, 1999, and no motion was ever made to substitute his estate in the case. On February 23, 2000, plaintiff's claims against defendants Keane, Kehn, and Healey were dismissed pursuant to Fed.R.Civ.P. 4(m) for failure to complete service on these defendants and file proof of service with the Court. The four John Doe defendants have never been identified or served.

**\*2**  Plaintiff filed an amended complaint on April 7, 2000.

After the completion of discovery, these motions followed.

### DISCUSSION

A. *Applicable Law*

1. *Summary Judgment Standard*

Summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but [to] determine whether there is a genuine issue for trial." *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual issue is genuine if it can reasonably be resolved in favor of either party. *Id.* at 250. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248.

In evaluating the record, the Court must resolve ambiguities and draw reasonable inferences against the moving party and assess whether there are any factual issues to be tried. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 903 (1990); *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999), *cert. denied,* 530 U.S. 1242 (2000).

In a motion for summary judgment, the moving party must first demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–22 (1986).

The nonmoving party may not rely on conclusory allegations to create disputed factual issues. *See Hussein v. Hotel Employees & Rest. Union, Local 6 ("Hussein v. Local 6"),* 108 F.Supp.2d 360, 365 (S.D.N.Y.2000) (citing *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)). Rather, the nonmoving party must present "significant probative evidence tending to support the complaint." *First Nat'l Bank of Arizona v. Cities Servs. Co.,* 391 U.S. 253, 290 (1968). *See Lujan,* 497 U.S. at 888 ("the object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint ... with conclusory allegations"); *Liberty Lobby,* 477 U.S. at 248 ("[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denial[s] of [his] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." ' (quoting Fed.R.Civ.P. 56(e))).

To defeat a motion for summary judgment, the nonmoving party must do more than raise "some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586; *see Fleurcis v. Short Line Hudson Transit Bus,* No. 99 Civ. 2754, 2000 WL 1863536, at \*4 (S.D.N.Y. Dec. 20, 2000). There is no issue for trial unless there exists sufficient evidence favoring the nonmoving party to support a jury verdict for that party. *Liberty Lobby,* 477 U.S. at 249–50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

**\*3**  Where a *pro se* litigant is involved, "the court has an obligation to read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Hussein v. Local 6,* 108 F.Supp.2d at 365 (internal quotations omitted) (alterations in original). Nonetheless, the same standards for dismissal apply. *Lee v. Artuz,* No. 96 Civ. 8604, 2000 WL 231083, at \*2 (S.D.N.Y. Feb. 29, 2000).

2. *Section 1983*

To state a § 1983 claim, a plaintiff must allege a violation of his constitutional or statutory rights by a person acting under the color of state law. 42 U.S.C. § 1983. To be liable under § 1983, the defendant must have been personally involved in the alleged violation. *See Wright*

*v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Tolliver v. Wilson,* No. 99 Civ. 9555, 2000 WL 1154311, at *5 (Aug. 14, 2000). Personal involvement, in this context, means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *see also Wright,* 21 F.3d at 501; *Tolliver,* 2000 WL 1154311, at *5. "Liability may not be premised on the respondeat superior or vicarious liability doctrines, ... nor may a defendant be liable merely by his connection to the events through links in the chain of command." *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (internal quotation omitted).

The Eighth Amendment, which applies to states under the Fourteenth Amendment due process clause, guarantees freedom from cruel and unusual punishment. Under the Eighth Amendment, prison officials are required "to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996); *see also Farmer v. Brennan,* 511 U.S. 825, 832 (1994); *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 220 (S.D.N.Y.1995). "Prison officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.' " *Lee,* 2000 WL 231083, at *4 (quoting *Farmer,* 511 U.S. at 834)). But, "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834.

To challenge conditions of confinement under the Eighth Amendment, a prisoner must show that the prison official or state actor acting with deliberate indifference to the prisoner's safety, subjected the prisoner to a sufficiently serious deprivation. *See Dawes v. Walker,* 239 F.3d 489, 493–94 (2d Cir.2001); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *Crawford v. Artuz,* No. 98 Civ. 0425, 2001 WL 289895, at *8 (S.D.N.Y. March 22, 2001). This requires a showing of both objective and subjective elements. With respect to the objective element, the alleged deprivation must

be so serious as to be "considered cruel and unusual." *Doyle v. Coombe,* 976 F.Supp. 183, 186 (W.D.N.Y.1996); *see also Farmer,* 511 U.S. at 834 (stating that a "prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities" (internal quotation omitted)). With respect to the subjective element, "the prison official involved must have acted with a 'sufficiently culpable state of mind.' " *McPherson,* 174 F.3d at 280 (quoting *Farmer,* 511 U.S. at 834 (internal quotation omitted)).

*4  Failure-to-protect claims are treated as challenges to conditions of confinement. *See Lee,* 2000 WL 231083, at *3 (citing *Edney v. Karrigan,* 69 F.Supp.2d 540, 544 n. 1 (S.D.N.Y.1999)). Where, as here, plaintiff challenges the condition of confinement, the relevant state of mind is deliberate indifference. *Id.*

The Eighth Amendment also guarantees that doctors, acting under the color of state law, will provide adequate medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Moreover, a physician, who under contract provides medical assistance to state inmates, acts under the color of state law. *West v. Atkins,* 487 U.S. 42, 54 (1988). To state a cognizable claim of Eighth Amendment violation under § 1983, a prisoner must allege deliberate indifference to his serious medical needs. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). "[A]llegations of inadvertent failure to provide adequate medical care ... or of a negligent diagnos[is] ... simply fail to establish the requisite culpable state of mind." *Id.* (internal quotation omitted).

**B. *Application***

*1. Claims Against Crawford*

Plaintiff alleges that Crawford violated his Eighth Amendment rights by failing to foresee the altercation and failing to prevent plaintiff's injuries. Plaintiff must show that, objectively, the conditions of his incarceration posed a substantial risk of serious harm, and, subjectively, Crawford acted with deliberate indifference. *See Farmer,* 511 U.S. at 834. Here, a reasonable jury could not find that Crawford acted with the state of mind required in an Eighth Amendment violation.

In failure-to-protect cases, "a prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.' " *Lee,* 2000 WL 231083, at *4 (quoting ⚑ *Hayes,* 84 F.3d at 620). Crawford was informed that an inmate had been assaulted earlier on April 13 and that the violence could continue. (Crawford Aff. ¶ 15). In response, Crawford inquired about these rumors by questioning corrections officers and the Imam. Despite his efforts, Crawford did not learn the identity of the inmate who was beaten or which inmates were involved, and he learned nothing to substantiate the rumors. (Crawford Aff. ¶¶ 18–19, 22–24 & 26). Moreover, prison officials do not respond to all purported threats of disruption. Indeed, "there must be some substantiation of information before any type of precautionary measures are employed ... because inmates have been known to spread rumors about one area in an attempt to divert security" from another. (Crawford Aff. ¶¶ 45–46).

Plaintiff argues that had Crawford made further inquiries with officials and inmates he could have learned more information that would have led him to prevent the altercation. The issue, however, is whether Crawford acted with deliberate indifference. Given that Crawford made several inquiries to correction officers and the Imam, and he did not ignore the rumors of planned violence, a reasonable jury could not find that Crawford acted with deliberate indifference. Indeed, Crawford was not even in the HBB when the incident occurred, and there is nothing concrete in the record to suggest that he should have done more than he did. Accordingly, summary judgment is granted to defendant Crawford and the claims against him are dismissed.

### 2. *Claims Against Roth, Buhta, & St. Agnes*

**\*5** Plaintiff alleges that Roth, Buhta, and St. Agnes are all liable for allegedly failing to provide adequate medical care. Specifically, plaintiff contends that Roth and Buhta injured plaintiff while operating on him at St. Agnes and that they failed to respond to plaintiff's complaints for several weeks after the surgery until a second surgery was finally performed. He also asserts negligence on the part of Roth, Buhta, and

St. Agnes. Plaintiff submits a medical report from his second surgery indicating that he required corrective measures, but he does not offer any evidence to support his claim that his injuries were caused by defendants, let alone caused by defendants' deliberate indifference. (*See* Am. Compl. Ex. E). Plaintiff cannot rely on conclusory allegations alone to defeat a motion for summary judgment. *See* ⚑ *Lujan,* 497 U.S. at 888; ⚑ *Liberty Lobby,* 477 U.S. at 249; ⚑ *D'Amico,* 132 F.3d at 149; 🚩 *Hussein v. Local 6,* 108 F.Supp.2d at 365.

Plaintiff offers no evidence, and only his conclusory allegations, to support his claim that defendants acted with deliberate indifference. Here, no reasonable jury could find that defendants acted with the requisite culpable state of mind. At best, plaintiff arguably has a medical malpractice claim, but "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Because ⚑ § 1983 does not cover medical malpractice, and federal courts do not have jurisdiction over medical malpractice cases, the claims against Roth, Buhta, and St. Agnes are dismissed. [1]

### CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted. The claims against Crawford are dismissed, with prejudice. The claims against Caballero are dismissed pursuant to Fed.R.Civ.P. 25(a)(1). The claims against the four John Does are dismissed, without prejudice. The claims against Roth, Buhta, and St. Agnes are dismissed, with prejudice as to the ⚑ § 1983 claims and without prejudice as to any common law medical malpractice claims that may be properly brought in state court. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2001 WL 410095

## Footnotes

1     Defendants also move to dismiss for failure to exhaust administrative remedies, qualified immunity, the statute of limitations, and the Eleventh Amendment of the Constitution. The claims brought against all defendants in their official capacities are also dismissed under the Eleventh Amendment. *See* *Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *K & A Radiologic Tech. Servs., Inc.. v. Comm'r of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). I do not reach the remaining arguments.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   U.S. v. Ortiz,   S.D.N.Y.,   May 9, 2013

1998 WL 796452

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Caprice CAMMICK, Sean Cammick, an Infant
under the age of 18 years, by Caprice Cammick, his
Guardian ad Litem, and Danielle Cammick, Plaintiffs,
v.
CITY OF NEW YORK, New York City Police
Department, Police Officer Eugene McHugh (Shield
# 18853), Police Officer Charles Kuhno (Shield
# 14901), Police Officer Paul Pizzuta (Shield #
26262), Detective Carlos Gonzalez (Shield # 1861),
Police Officer John Doe, Police Officer Richard
Roe, and Police Officer Jane Doe, Defendants.

No. 96 Civ. 4374(RPP).
|
Nov. 17, 1998.

**Attorneys and Law Firms**

Donald E. Cameron, New York, NY, for Plaintiffs.

Michael D. Hess, Corporation Counsel, The City of New
York, New York, NY, By: Elisa Baldwin, for Defendants.


OPINION AND ORDER

PATTERSON, J.

 **\*1**  Defendants move at the close of discovery for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure dismissing the complaint which seeks damages for
violations of 42 U.S.C. § 1983 and state causes of action
for false arrest, abuse of process, malicious prosecution,
assault, intentional infliction of emotional distress and
conversion of plaintiffs' property. Although this action was
commenced on June 13, 1996, Police Officers John Doe,
Richard Roe and Jane Doe have not been served by
plaintiffs. Accordingly, the complaint is dismissed as to those
defendants for lack of service of process. Fed.R.Civ.P. 4(m).

*Background*

The case arises out of the arrest on February 28, 1995, of
Caprice and Danielle Cammick for possession of a loaded
semiautomatic gun following the execution by police officers
of a search warrant of their residence. (Affirmation of Donald
E. Cameron dated May 29, 1998 ("Cameron Affirm."), Ex.
E). Caprice and Danielle are sisters who live together in
apartment 4C at 1809 Seventh Avenue in Manhattan (the
"apartment"). Sean Cammick is Caprice's infant son. Caprice
was 20 years old at the time of the incident, Danielle was
16, and Sean was 4. The police officer defendants had
been issued a search warrant for the premises by Patricia
Williams, Justice, Supreme Court, New York County, and
were authorized by the Court to search the apartment for
"cocaine and crack/cocaine paraphernalia used to process
and distribute cocaine, and firearms." (Declaration of Elisa
Baldwin dated March 20, 1998 ("Baldwin Dec."), Ex. A.)

Pursuant to the search warrant, on February 28, 1995,
defendants McHugh, Kuhno, and Pizzuta and other
unidentified police officers entered the plaintiffs' apartment
and performed a search. The search turned up a bullet-proof
vest, a loaded M–11 9 millimeter firearm, and an imitation
pistol (Cameron Affirm., Ex B (McHugh Dep. at 12–13);
Kuhno Dep. at 20.) Caprice and Danielle were then arrested
for possession of the firearm. (McHugh Dep. at 25–26.) A
police laboratory analysis report on the gun determined that
the gun is an "Operable Machine–Gun as Defined in Section
165.00 Subdivision 1. of the N.Y.S. Penal Law." (Baldwin
Dec., Ex. B.)

None of the plaintiffs' names was listed specifically on the
search warrant. Sean Jenkins, Sean Cammick's father, who
was listed specifically on the warrant, was not present at the
time of the police search, and Caprice Cammick informed
the officers present during the search that Sean Jenkins
did not live there and that it was her apartment. (Caprice
Cammick Dep. at 32.) Danielle Cammick resided with her
sister. (Danielle Cammick Dep. at 8.)

Plaintiffs allege that the defendants "unreasonably and
unjustifiably broke into plaintiffs' apartment and ransacked
it, causing extensive damage to Plaintiffs' apartment and
personal belongings while physically and verbally abusing
Plaintiffs." (Compl.¶ 15.) They allege that the "Defendants
also unjustifiably and unreasonably placed Plaintiffs in fear
of death and/or serious bodily injury in that, to wit, one
of the Defendants drew his gun in the immediate presence
of Plaintiffs Caprice Cammick and Danielle Cammick, who

were in the zone of danger, and pointed it in the direction of Plaintiff Sean Cammick, said conduct also causing Plaintiffs' severe emotion distress." (*Id.* ¶ 16.)

**\*2** Defendants have moved for summary judgment on several grounds. First, Defendants contend that plaintiffs' federal and state claims for false arrest and malicious prosecution should be dismissed because Caprice and Danielle Cammick's arrest for possession of the gun was reasonable and proper under both New York Statute, N.Y. Penal Law § 265.15(1) and state and federal common law. New York Penal Law § 265.15(1) creates a presumption that the presence in any room, dwelling, structure, or vehicle of any machine-gun is evidence of its unlawful possession by all persons occupying the place where the machine-gun is found. The common law provides that a person constructively possesses tangible property when she exercises "dominion and control" over the property by having a sufficient level of control over the area where the contraband is found. *See Torres v. Hanslmaier*, 94 Civ. 4082(MGC), 1995 U.S. Dist. LEXIS 6193 at *6– *7 (S.D.N.Y. May 2, 1995) (copy attached to Def. Mem.). Second, defendants argue that plaintiffs' claim that plaintiffs' Fourth and Fourteenth Amendment rights were violated by defendants' search of their apartment during which the police ransacked their apartment and destroyed and damaged their property should be dismissed because the search warrant authorized the search, searches necessarily entail some damage to property, and the plaintiffs' allegations of property damage are conclusory. Third, defendants argue that defendants McHugh, Kuhno, and Pizzuta, the arresting officers, are entitled to summary judgment on plaintiffs' 🚩 § 1983 claims on grounds of qualified immunity. Fourth, defendants argue that defendant City of New York is entitled to summary judgment because the plaintiffs cannot establish the existence of a municipal policy or practice which caused a constitutional deprivation. Fifth, defendants contend that the complaint should be dismissed against the New York City Police Department because it is not a suable entity. Sixth, defendants argue that all claims against defendant Gonzalez must be dismissed because he was not involved in the search or the arrest of plaintiffs. Seventh, defendants argue that if the Court dismisses the plaintiffs' federal claims, it should not take jurisdiction over the plaintiffs' state law claims. And eighth, defendants contend that if the Court does take jurisdiction over the state law claims, they should still be dismissed because plaintiffs have not stated claims for emotional distress or assault.

## Discussion

Plaintiffs concede that (1) the *Monell* claim against the City of New York should be dismissed because there is no evidence of a municipal policy or practice causing a constitutional deprivation; (2) all claims against the New York City Police Department should be dismissed because it is not a suable entity; and (3) that all claims against defendant Gonzalez should be dismissed because he was not involved in the incident. (Pl. Mem. at 13, 19–20.) Plaintiffs argue that the remaining claims should not be dismissed.

### 1. *False Arrest/Malicious Prosecution*

**\*3** With respect to plaintiffs' 🚩 42 U.S.C. § 1983 claim and state claims for false arrest and malicious prosecution, summary judgment is granted because the undisputed evidence shows that defendant officers entered and searched plaintiffs' apartment pursuant to a search warrant and had good reason to believed that the gun was in the constructive possession of Danielle and Caprice, the admitted residents of the apartment. They therefore had probable cause for the arrests.[1] Plaintiffs argue correctly that the presumption of N.Y. Penal Law § 2265.15(1), which states "The presence in any room, dwelling, structure, or vehicle of any machine-gun is presumptive evidence of its unlawful possession by all persons occupying the place where such machine-gun if found," is inapplicable because the defendant officers' state of mind at the time of the arrest was that the firearm was only a semi-automatic. (Kuhno Dep. at 20.) Nevertheless, there is also a presumption of the common law that a person is in constructive possession of property when she exercises dominion and control over the area in which the property is found. *Torres, supra;* 🚩 *United States v. Anderson,* 881 F.2d 1128, 1141 (D.C.Cir.1989); 🚩 *United States v. Morales,* 851 F.Supp. 112, 116 n. 6 (S.D.N.Y.1994), *aff'd* 101 F.3d 107 (2d Cir.1996). Plaintiffs' arguments that the pistol was found in a closet which also contained men's clothing and that the defendants "did not possess knowledge that would allow them to conclude that the weapon belonged to either Caprice or Danielle" (Pl. Mem. at 5) are irrelevant. Caprice and Danielle were arrested for criminal possession, not ownership, of a firearm. (McHugh Dep. at 26.) The gun was still in the plaintiffs' constructive possession because they jointly exercised dominion and control over their apartment. Accordingly, the officers had adequate grounds to arrest the plaintiffs Caprice and Danielle for possession of the firearm. *Torres,* 1995 U.S. Dist. LEXIS 6193, at *6– *7.

2. *Assault and Intentional Infliction of Emotional Distress*
Plaintiffs' claims for assault and intentional infliction of emotional distress are also dismissed. Deposition testimony submitted on the motion stated that one of the other individuals in an emergency services unit entered the apartment and conducted a security search prior to the named defendants' entry to conduct the search for narcotics, narcotics paraphernalia and a gun; this other person was the one who pointed a gun at Sean Cammick and Danielle Cammick. (Cameron Affirm., Ex. C (C. Cammick Dep. at 25–26, 28); Kuhno Dep. at 16–17.) Plaintiffs offer no evidence suggesting that the person who committed the assault was defendant Kuhno, defendant McHugh, or defendant Pizzuta. (Compl.¶ 16.)

3. *Plaintiffs Federal Claim for Property Damage*
Plaintiffs' claim here is based on alleged conduct by the defendants in destroying property during the search to such an extent that a jury could conclude that defendants' conduct was unreasonable or intended to inflict emotional distress. Defendants deny they destroyed plaintiffs' property unnecessarily. Defendants rely solely on a case in which summary judgment was granted. *Soichet v. Toracinta*, No. 93 Civ. 8858(LAP), 1995 WL 489434, at *6 (S.D.N.Y. Aug. 16, 1995), *aff'd* 111 F.3d 124 (2d Cir.1997).[2] In *Soichet*, the plaintiff claimed that government agents had ransacked her apartment and caused property damage, but because the plaintiff's allegations were insufficient to provide a basis upon which a jury could determine that the officers' conduct had been unreasonable, the defense's motion for summary judgment was granted. The Second Circuit affirmed dismissal

of the claim. Here, in contrast, plaintiffs' allegations are much more detailed and plaintiffs assert they have photographs which show extensive damage. (Neither side has submitted the photographs for the Court's inspection.) While it is reasonable for a search to produce a limited amount of damage, a jury could conclude that the damage sustained here by plaintiffs (*see* Pl. Mem. at 7–10) was unreasonable and unnecessary for the conduct of a search for drugs and guns. Nevertheless, the plaintiffs have not shown that any of the named defendants, as opposed to other officers involved in the security search or the search for narcotics and a gun, were responsible for any of the damage they claim occurred during the search, let alone the unnecessary damage. And in any case, there can be no claim of municipal liability under § 1983 based on respondeat superior liability. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, summary judgment is granted as to this claim of violation of federal law.

4. *Conversion*
 **\*4** As the federal claims are dismissed, the Court declines to exercise jurisdiction over plaintiffs' remaining state law claims, including a pendent state law conversion claim. *Dunton v. City of Suffolk,* 729 F.2d 903, 910–11 (2d Cir.1984), *amended by* 784 F.2d 69 (2d Cir.1984).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 796452

## Footnotes

1    Furthermore, Officer Kuhno had received information that Caprice and Danielle, as well as Jenkins, had been engaged in narcotic drug activities in the apartment. (Cameron Affirm., Ex. B (Kuhno Dep. at 7).) Those engaged in narcotic drug activities are known often to utilize guns for protection of the drugs.

2    Defendants actually rely on the unpublished decision of the Second Circuit affirming the District Court, *See Soichet v. Toracinta,* # 95–2771, 1997 U.S.App. LEXIS 7171 (2d Cir. Apr. 15, 1997) (copy attached to Def. Mem.). Second Circuit Rule 0.23 expressly prohibits the citation to summary orders as precedential authority.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 713809
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jerome WALDO, Plaintiff,

v.

Glenn S. GOORD, Acting Commissioner of New
York State Department of Correctional Services;
Peter J. Lacy, Superintendent at Bare Hill Corr.
Facility; Wendell Babbie, Acting Superintendent
at Altona Corr. Facility; and John Doe, Corrections
Officer at Bare Hill Corr. Facility, Defendants.

No. 97–CV–1385 LEK DRH.
|
Oct. 1, 1998.

**Attorneys and Law Firms**

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst. Attorney
General, for Defendants.

DECISION AND ORDER

KAHN, District J.

 **\*1** This matter comes before the Court following a Report–
Recommendation filed on August 21, 1998 by the Honorable
David R. Homer, Magistrate Judge, pursuant to 28 U.S.C.
§ 636(b) and L.R. 72.3(c) of the Northern District of New
York.

No objections to the Report–Recommendation have been
raised. Furthermore, after examining the record, the
Court has determined that the Report–Recommendation is
not clearly erroneous. *See* Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the Report–
Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report–Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice
as to the unserved John Doe defendant pursuant to
Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its
entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.

HOMER, Magistrate J.

REPORT–RECOMMENDATION AND ORDER [1]

The plaintiff, an inmate in the New York Department
of Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges
that while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and Fourteenth
Amendments. [2] In particular, plaintiff alleges that prison
officials maintained overcrowded facilities resulting in
physical and emotional injury to the plaintiff and failed
to provide adequate medical treatment for his injuries and
drug problem. Plaintiff seeks declaratory relief and monetary
damages. Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the
reasons which follow, it is recommended that the motion be
granted in its entirety.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while
he and two other inmates were playing cards, an argument
ensued, and one of the two assaulted him. Compl., ¶ 17.
Plaintiff received medical treatment for facial injuries at the
prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18–
19. On September 11, 1997, plaintiff was transferred to Altona
and went to Plattsburgh Hospital for x-rays several days later.
*Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10–11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21–22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27–28.

## II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

## III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347–48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed

for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

### 2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21–22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs.

*See* *Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610–11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760–61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See* *Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff

from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." 🔖 *Heisler v. Kralik*, 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also* 🔖 *Villante v. Dep't of Corr. of City of N.Y.*, 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." 🔖 *Farmer*, 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. 🔖 *Farmer*, 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen*, No. 96–CV–656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York*, No. 97–CIV–0387, 1998 WL 338097, at *3–4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the

blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

## IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

## V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report–Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 🔖 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 🔖 *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); 🔖 *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989); 🔖 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 713809

## Footnotes

1    This matter was referred to the undersigned pursuant to 🚩 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona
     are made against Goord and Babbie.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Nov. 29, 2004.

**Attorneys and Law Firms**

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   Neural Magic, Inc. v. Meta Platforms, Inc.,   D.Mass.,
March 6, 2023

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION
d/b/a Glaxosmithkline, Defendant.

*MEMORANDUM–DECISION AND ORDER*

No. Civ.A. 02–CV–0745NPM.

MCCURN, Senior J.

|

I. Preclusion Motion..........................................................................................................  4

A. Standard for Admissibility of Expert Evidence...........................................................  6

1. Deborah L. Sweeney......................................................................................................  9

a. Qualified?.....................................................................................................................  9

2. Kevin W. George, M.D..................................................................................................  10

3. James T. O'Donnell........................................................................................................  13

a. General Causation.........................................................................................................  14

i. Qualified?......................................................................................................................  14

ii. Reliability of Testimony?............................................................................................  17

b. Specific Causation........................................................................................................  19

c. Warnings.......................................................................................................................  19

i. Qualified?......................................................................................................................  20

ii. Reliability of Testimony?............................................................................................  22

II. Summary Judgment Motion........................................................................................... 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to

exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications.' " *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.*

(citing 📙 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 📙 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing 📙 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " 📙 *Amorgianos,* 303 F.3d at 265 (quoting 📙 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

1. Deborah L. Sweeney

a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* ⚠ *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way,* ..., of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* 🚩 *Munafo v. Metropolitan Transportation Authority,* Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp.,* No. CV 94–4009, 1998 WL 623589, at *19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis.' ')

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In 🚩 *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. 🚩 *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* Nora Beverages, 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of

having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* Kumho Tire, 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*

### ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmacologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.

### II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger*, 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

   Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**Devito v. Smithkline Beecham Corp., Not Reported in F.Supp.2d (2004)**

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 84 of 100

2019 WL 3958443
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William A. OSORIO, Plaintiff,

v.

WESTCHESTER COUNTY, et al., Defendants.

No. 18-CV-5620 (KMK)
|
Signed 08/21/2019

**Attorneys and Law Firms**

William A. Osorio, Valhalla, NY, Pro Se Plaintiff.

Loren Zeitler, Esq., Westchester County Department of Law,
White Plains, NY, Counsel for Defendants.

Mony B.P. Yin, Esq., Thomas J. Bracken, Esq., Bennett,
Bricklin & Saltzburg, LLC, New York, NY, Counsel for
Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

**\*1** William A. Osorio ("Plaintiff") brings this pro
se Action, pursuant to 📄 42 U.S.C. § 1983, against
Westchester County, Aramark Correctional Services, LLC
("Aramark"), Warden Francis Delgrosso ("Delgrosso"),
and Aramark Food Service Director Manuel Mendoza
("Mendoza") (collectively, "Defendants"), alleging that
Defendants provided him with substandard and unhygienic
food while incarcerated at Westchester County Jail, in
violation of the Fourteenth Amendment. Before the Court is
Defendants' Motion To Dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6) (the "Motion"). (Not. of Mot. (Dkt.
No. 17).) For the following reasons, the Motion is granted.

I. Background

A. Factual History
The following facts are drawn from Plaintiff's Complaint,
(Compl. (Dkt. No. 2)), and are taken as true for purposes of
resolving the instant Motion.

Plaintiff alleges that, since his arrival at Westchester County
Jail ("WCJ") on October 30, 2017, Defendant Aramark has
provided him with substandard and unhygienic food. (Compl.
5–6.) [1] In particular, Plaintiff — who is supposed to be on
a "diabetic diet" — alleges that his meal trays arrive with
"rotte[n] food[ ]"; that his "salad is always brown and soggy";
that his "meat is always raw and look[s] pink"; that he "find[s]
insects" and "dead [flies]" in [his] food"; that the meal trays
have "mold" and "[leftover] food from [previous] meals" on
them; and that the food tastes "like pieces of plastic [are]
coming off the tray and mixing with the food." (*Id.*) As a
result, Plaintiff has experienced "nausea, explosive diarrhea,
vomiting, stomach cramps, fatigue, headaches, hunger pangs,
[and] dehydration." (*Id.* at 7.)

Plaintiff alleges that Defendant Delgrosso "knows" of the
food problem "through gri[e]vances, investigations[,] and
complaints, but fails to take corrective actions." (*Id.* at 5.)
Plaintiff also alleges that Kitt (not named as a defendant)
refused to accept his grievance on grounds that he was "not
accepting Aramark grievances." (*Id.* at 6.) Finally, Plaintiff
alleges that Defendants Delgrosso and Mendoza (along with
Spano and Flax, not named as defendants) "attend[ ] daily
meetings" in which they "discuss ... food [grievances] and
lawsuits." (*Id.*)

B. Procedural History
The initial Complaint was filed on June 20, 2018. (Compl.)
On July 18, 2018, the Court granted Plaintiff's request to
proceed in forma pauperis ("IFP"). (Dkt. No. 4.) Defendants
filed the instant Motion To Dismiss on December 5, 2018.
(Not. of Mot. (Dkt. No. 17); Mem. of Law in Supp. of
Mot. ("Defs.' Mem.") (Dkt. No. 18).) Plaintiff did not file a
response in opposition. On May 24, 2019, the Court granted
Defendants' request to consider the Motion fully submitted.
(Dkt. No. 20.)

II. Discussion

Defendants principally argue that Plaintiff's Fourteenth
Amendment conditions-of-confinement claim as to
Westchester County, Aramark, and the individual Defendants
in their official capacities fails because Plaintiff has not
established *Monell* liability; that Plaintiff fails to establish
the personal involvement of the individual Defendants in any
constitutional violation; and that, on the merits, Plaintiff fails
to state a conditions-of-confinement claim. (Defs.' Mem. 8–

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 85 of 100

15.)[2]  The Court addresses each argument separately to the extent necessary.

### A. Standard of Review

**\*2**  The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam);

*see also Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.,* 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments [it] suggest[s]." *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell,* 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County,* 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco,* No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).

### B. Analysis

#### 1. *Monell* Liability

Defendants argue that Plaintiff fails to plausibly allege *Monell* liability as to Westchester County, Aramark, and the individual Defendants in their official capacities. (Defs.' Mem. 8–11.)

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 86 of 100

policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). Therefore, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell*, 436 U.S. at 690–691). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (citation omitted). A plaintiff may satisfy the fifth element by alleging one of the following:

> **\*3** (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).

Here, Plaintiff does not allege the existence of a formal policy or widespread informal custom, nor does he allege that a municipal official with policymaking authority took certain actions that caused the alleged problems at issue in this case. Rather, Plaintiff squarely alleges, under the fourth prong above, that Westchester County "fails to supervise" Aramark's food preparation at WCJ to "ensure ... compliance." (Compl. 6.) On its own, this "boilerplate" allegation "is insufficient, without more, to state a *Monell* claim." *Dawson v. Westchester County*, No. 18-CV-7790, 2019 WL 3408899, at *4 (S.D.N.Y. July 29, 2019) (citations and alterations omitted). To state a *Monell* claim based on a failure to supervise, Plaintiff must allege "(1) [that] there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) [that] the municipality consistently failed to investigate those allegations." *Treadwell v. County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citation omitted). Plaintiff must also allege that the municipality was deliberately indifferent to its employees' conduct, for example, by showing "that the need for more or better supervision to protect against constitutional violations was obvious," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). Plaintiff alleges here that Delgrosso "knows" of the food-related problems at WCJ as a result of receiving grievances, investigations, and complaints, (Compl. 5), and that Delgrosso and Mendoza (along with others not named as defendants) "attend[ ] daily meetings" in which they "discuss ... food [grievances] and lawsuits," (*id.* at 6). It is true that Plaintiff may establish deliberate indifference from the fact that there "were repeated complaints of civil rights violations" and that "the complaints [were] followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, at *9 (S.D.N.Y. Sept. 27, 2012) (citation and quotation marks omitted); *see also Lawrence v. City of Rochester*, No. 09-CV-6078, 2015 WL 510048, at *7, 9 (W.D.N.Y. Feb. 6, 2015) (same). However, cases in which plaintiffs have successfully established deliberate indifference by pointing to previous grievances and lawsuits have involved pleadings that name and detail those previous lawsuits. *See Edwards v. City of New York*, No. 14-CV-10058, 2015 WL 5052637, at *6 (S.D.N.Y. Aug. 27, 2015) (holding that the plaintiff sufficiently alleged the need for better supervision where he "cited government reports, news articles[,] and [18] prior lawsuits" to "create a plausible inference that the [municipality] has not meaningfully acted to improve training and/or supervision to prevent further incidents"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652,

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 87 of 100

at *20 (S.D.N.Y. Mar. 26, 2015) (holding that the plaintiff's "allegations [describing nine lawsuits over five years] allow[ed] the Court to plausibly infer that the [municipality] was on notice" of the allegedly unconstitutional conduct);

*McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4–5 (S.D.N.Y. Nov. 21, 2014) (holding that the plaintiff sufficiently alleged the need for better supervision where he listed and detailed seventeen other complaints over a seven-year period raising similar allegations against the same defendants); *Farrow v. City of Syracuse*, No. 12-CV-1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (stating that the fact that "at least 15 excessive force complaints ha[d] been filed against the [c]ity in the past 5 years" would be sufficient to state a plausible failure to train claim); *cf. An v. City of New York*, 230 F. Supp. 3d 224, 231 (S.D.N.Y. 2017) (holding that citation to "six lawsuits and one newspaper article over the span of four years is insufficient to plausibly allege the [municipality's] need [to act] was obvious"). Plaintiff has failed to name or detail those alleged lawsuits, grievances, or investigations here. Therefore, Plaintiff's barebones allegation that Westchester County knew about WCJ's alleged food problems through receipt of complaints, grievances, and lawsuits does not, without more, plausibly allege a failure to supervise claim. *See Dawson*, 2019 WL 3408899, at *5 (dismissing *Monell* claim where the plaintiff alleged, in conclusory fashion, that WCJ and Aramark officials were aware of food preparation problems through prior lawsuits, inmate grievances, and daily meetings).

**\*4** Accordingly, Plaintiff's claims against Westchester County and Aramark are dismissed, as are his claims against the individual Defendants in their official capacities. *See Jackson v. Westchester County*, No. 18-CV-7207, 2019 WL 3338020, at *5 (S.D.N.Y. July 25, 2019) (dismissing claims against municipality and individual defendant in official capacity where the plaintiff failed to plausibly allege *Monell* liability).

## 2. Personal Involvement

Defendants argue that Plaintiff fails to allege the personal involvement of Delgrosso or Mendoza in any constitutional violation. (Defs.' Mem. 11–13.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133,138 (2d Cir. 2013) (citation omitted). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citation, italics, and quotation marks omitted). In other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Here, Plaintiff alleges, as noted above, that Delgrosso "knows" of the food-related problems at WCJ as a result of receiving grievances, investigations, and complaints, (Compl. 5), and that Delgrosso and Mendoza (along with others not named as defendants) "attend[ ] daily meetings" in which they "discuss ... food [grievances] and lawsuits," (*id.* at 6). These allegations require further factual development. "Plaintiff does not provide facts alleging *what*," in particular, Delgrosso and Mendoza "knew about the poor food problem or *when* they knew about it." *Dawson*, 2019 WL 3408899, at *6 (citations, quotation marks, and alterations omitted). "Moreover, Plaintiff does not allege that" Delgrosso or Mendoza "participated directly in the preparation or distribution of food at all (let alone in the preparation or distribution of the particular food at issue), established a

Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 88 of 100

policy or custom that allowed for rotten food to be provided to inmates, failed to follow a policy or custom on food preparation, or were otherwise grossly negligent in allowing others to prepare food without following proper procedures." *Id.* That Delgrosso and Mendoza may hold supervisory positions at WCJ "does not change the analysis, because a defendant cannot be held liable for the service of rotten food based on a respondeat superior theory." *Id.* (citation, quotation marks, and original alterations omitted); *see also*

*Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.");

*Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014) ("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct." (citations omitted)). There are, in sum, insufficient facts in the Complaint to plausibly suggest that Delgrosso or Mendoza were personally involved in the alleged unconstitutional deprivation at issue. *See Webster v. Fischer*, 694 F. Supp. 2d 163, 179 (N.D.N.Y. 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."). Accordingly, Plaintiff's claims

against Delgrosso and Mendoza in their individual capacities are dismissed. [3]

### III. Conclusion

**\*5** For the foregoing reasons, Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, dismissal is without prejudice. If Plaintiff wishes to file an amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is advised that the amended complaint will replace, not supplement, all prior complaints and filings. The amended complaint must contain *all* of the defendants, claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. [4] If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3958443

### Footnotes

1   Plaintiff's filings do not use consistent pagination. To avoid confusion, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

2   To the extent Defendants also make a qualified immunity "argument," (*see* Defs.' Mem. 15), Defendants merely restate the qualified immunity caselaw without meaningfully applying it to the facts of the case. The Court therefore declines to consider at this time whether Defendants are protected by qualified immunity.

3   Because the Court has dismissed all Defendants on other grounds, it need not fully consider whether Plaintiff states a Fourteenth Amendment claim based on the provision of substandard and unhygienic food. The Court notes, however, that the Constitution "require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation and quotation marks omitted). Plaintiff's allegations that he was served — while on a "diabetic diet" — undercooked, unhygienic, and contaminated food, thereby causing him illness, (Compl. 5–7), are nearly identical to other cases in which courts have held the objective prong satisfied. *See Moore v. Westchester County*, No. 18-CV-7782, 2019 WL 3889859, at *5 n.4 (S.D.N.Y. Aug. 19, 2019) (collecting cases in which courts have held that allegations of substandard, unhygienic, and contaminated food at WCJ satisfied the objective

**Osorio v. Westchester County, Not Reported in Fed. Supp. (2019)**

Case 9:21-cv-00806-DNH-ML    Document 62    Filed 12/15/23    Page 89 of 100

prong required to state a Fourteenth Amendment claim). The Court expects that counsel for Defendants will meaningfully address these repeated and serious allegations with their clients.

4    As Judge Briccetti recently put it in a similar case alleging deficient food at WCJ, Plaintiff should, in amending his complaint:

    1. give the dates and times of each incident in which [he] was served the food described in his complaint;

    2. describe how each defendant was involved in serving [him] such food — for example, whether the defendant personally served him that food, was present when [he] was served such food, or otherwise knew [he] was served the food;

    3. describe how each defendant knew or should have known the food served to [him] was inadequate;

    4. state which, if any, defendants [he] informed of the problems with his food on each such occasion, how the defendants responded to his complaints, and how the defendants' responses or lack thereof contributed to his injury;

    5. include any details why [he] believes Aramark, Westchester County, or any of their employees gave him such food or failed to remedy his complaints; and

    6. include any facts regarding the existence of an official Aramark or Westchester County policy or [unofficial] custom that caused the deprivation of a constitutional right.

*Crispin v. Westchester County*, No. 18-CV-7561, 2019 WL 2419661, at *5 (S.D.N.Y. June 10, 2019).

---

**End of Document**                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.



**User Name:** jennifer painter
**Date and Time:** Friday, December 15, 2023 10:59:00AM EST
**Job Number:** 212762449

## Document (1)

1. _Beers v. GMC, 1999 U.S. Dist. LEXIS 12285_

   **Client/Matter:** -None-

   **Beers v. GMC, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285:**

   **Search Type:** Natural Language

   **Narrowed by:**

   | Content Type | Narrowed by |
   |---|---|
   | Cases | -None- |

⚠️ Caution
As of: December 15, 2023 3:59 PM Z

# *Beers v. GMC*

United States District Court for the Northern District of New York

May 17, 1999, Decided ; May 17, 1999, Filed

97-CV-482 (NPM/DNH)

**Reporter**
1999 U.S. Dist. LEXIS 12285 *; 1999 WL 325378

MARK W. BEERS and JANET BEERS, Plaintiffs, -against- GENERAL MOTORS CORPORATION, Defendant.

**Disposition:** [*1] GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* GRANTED. Defendant's motion for summary judgment GRANTED in entirety.

## Core Terms

fan, flex, spoliation, assembly, summary judgment, discovery, inspection, sanctions, district court, tire, motion to dismiss, lesser sanction, argues, orders, blade, truck, fault, crucial evidence, court order, exemplar, warning, wheel, summary judgment motion, spoliation of evidence, order to show cause, failure to warn, manufacturer, overinflated, exploded, mounting

## Case Summary

### Procedural Posture

Defendant automobile manufacturer moved for dismissal pursuant to *Fed. R. Civ. P. 37(b)(2)* or, alternatively, for summary judgment of plaintiff's product liability case. The motion for dismissal was based on plaintiff's loss of crucial evidence.

### Overview

Plaintiff was injured by a fan installed on a pickup truck that was manufactured by defendant. Plaintiff's expert, in examining it, disassembled and irreparably altered the fan assembly from its condition at the time of the accident and eventually misplaced it. Defendant moved for dismissal of plaintiff's subsequent suit, pursuant to *Fed. R. Civ. P. 37(b)(2)*, after plaintiff failed to comply with numerous court orders to produce the fan for inspection. The court held that plaintiff should be held responsible for both his expert's loss of the crucial evidence and his counsel's defiance of court orders. Dismissal was proper because the spoliated evidence

was not circumstantial; due to the nature of the evidence, effective lesser sanctions would be tantamount to summary judgment; lesser sanctions would not remedy defendant's prejudice because it did not know exactly what inspection of the fan would have revealed as a potential defense; no mitigating factors were present; and plaintiff's counsel's disregard of discovery and other orders of the court supported dismissal as a sanction under *Rule 37* and under the court's inherent power to control litigation before it.

### Outcome

The court dismissed plaintiff's case, first, because it served as a deterrent to plaintiff's counsel, his expert, and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment was thereby placed on the party who lost the critical evidence. Third, it appeared no other sanction would restore defendant to the position it would have been in absent the spoliation.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

*HN1*[⤓] **Methods of Discovery, Inspection & Production Requests**

Spoliation of evidence consists of the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. A federal court may impose sanctions upon a party who engages

1999 U.S. Dist. LEXIS 12285, *1

in spoliation in derogation of court order. Even in the absence of a discovery order, the court may impose sanctions for spoliation, exercising its inherent power to control litigation.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

**HN2[⬇]  Standards of Review, Clearly Erroneous Review**

Sanctions for spoliation, including dismissal, are reviewed by the court for abuse of discretion. The court will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN3[⬇]  Discovery, Misconduct During Discovery**

The district court possesses broad discretion in crafting a proper sanction for spoliation but such sanction is to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine. This sanction is fashioned to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

**HN4[⬇]  Discovery, Misconduct During Discovery**

Outright dismissal of a lawsuit as a sanction for spoliation is within the court's discretion. Dismissal is proper if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party. Dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is any fault of the sanctioned party. Negligent wrongs, like intentional wrongs, are proper subjects for general deterrence.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

Civil Procedure > Discovery & Disclosure > General Overview

**HN5[⬇]  Discovery, Misconduct During Discovery**

The district court possesses the discretion to dismiss for disobedience of discovery orders.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

**HN6[⬇]  Discovery, Misconduct During Discovery**

Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. However, in fashioning a sanction, the district court must take into account the ability of the sanction to restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

Torts > Products Liability > Theories of Liability > Negligence

**HN7[⬇]  Theories of Liability, Negligence**

A manufacturer is not responsible for injuries resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe.

Civil Procedure > ... > Summary

1999 U.S. Dist. LEXIS 12285, *1

Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Waiver & Preservation of Defenses

_HN8_[↧]  **Summary Judgment, Supporting Materials**

Failure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y. L.R. 7.1(b)(3).

**Counsel:** For Plaintiff: Diane V. Bruns, Esq., LoPinto, Schlather, Solomon & Salk, Ithaca, New York.

For Defendant: Timothy S. Coon, Esq., Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, Pennsylvania.

For Defendant: Margaret J. Fowler, Esq., Chernin & Gold, LLP, Binghamton, New York.

**Judges:** Neal P. McCurn, Senior United States District Judge.

**Opinion by:** Neal P. McCurn

# Opinion

### MEMORANDUM-DECISION & ORDER

### INTRODUCTION

Defendant General Motors ("GM") moves for dismissal pursuant to _Federal Rule of Civil Procedure 37(b)(2)_, [1] **[*2]** or alternatively, for summary judgment. The motion for dismissal is based on plaintiff's loss of crucial evidence. Plaintiff opposes the sanction of dismissal, and argues in part that summary judgment is

inappropriate. [2] For the reasons that follow, the court grants GM's motion to dismiss, or in the alternative, grants summary judgment.

### BACKGROUND

Plaintiff Mark Beers was injured in March of 1994 while working on a friend's 1984 GM pickup truck. The truck had a flexible engine cooling fan ("flex fan") installed to cool the engine. It is undisputed that this flex fan did not belong on the truck, and was installed by a third party. [3] At some point, while the engine was running, one of the flex fan blades broke off, penetrated the plastic protective shroud, and struck plaintiff, injuring him.

**[*3]** Plaintiff retained legal counsel, and the flex fan assembly was obtained from the owner of the truck. Plaintiff's expert, Robert Wehe, then examined the flex fan assembly. _See_ Wehe Dep. at 11. As part of the inspection, he disassembled the flex fan assembly, which irreparably altered it from its condition at the time of the accident. _See_ GM's Supplemental Br. Ex. 1 at P 20, docket no. 62. Moreover, plaintiff's counsel never notified GM that the flex fan was to be taken apart, gave it the opportunity to be present, or allowed it to inspect the flex fan first. _See id._ at PP 21-22. No video or photos were taken at the time of disassembly. _See id._ at P 23. Although Wehe now claims the fan blade broke because of a design defect, he also noted the arm which held that blade was "severely bent." [4] **[*4]** Wehe Dep. at 11. Wehe recognized that this damage could have caused the blade to come off. [5] _See id._ at 79-80. In response to

---

[1] **_Fed. R. Civ. P. 37(b)(2)_** states:

   If a party . . . fails to obey an order to provide or permit discovery . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: . . . (C) An order striking out pleadings or parts thereof . . . or dismissing the action or proceeding . . . or rendering a judgment by default against the disobedient party[.]

_Fed. R. Civ. P. 37(b)(2)_.

---

[2] Although GM moves for summary judgment on all of plaintiff's claims, including failure to warn, _see_ Def. Mem. of Law at 18 n. 7, docket no. 48 and Def. Response at 6-8, docket no. 67, plaintiff fails to oppose summary judgment on the failure to warn claim.

[3] It appears the flex fan was from a 1974 GM truck. Trucks designed with flex fans had metal protective shrouds over the fans. The 1984 type of truck involved in plaintiff's injury was not designed to have a flex fan, and had a plastic protective shroud over the fan.

[4] The possibility that the flex fan failed due to prior damage is a major reason GM moves for dismissal. GM's primary defense theory is that the fan was not defective, but failed because it had been previously damaged. GM argues it is unable to present such a defense because the flex fan, except for a few pieces, is now missing, and thus its expert is not capable of effectively rendering such an opinion.

[5] At a later portion of his deposition, Wehe maintained that he

1999 U.S. Dist. LEXIS 12285, *4

the present motion, Wehe now admits that he has misplaced most of the flex fan assembly, and that it is lost. See Wehe Aff. at P 3, docket no. 56.

Plaintiff brought suit against GM in the New York Supreme Court, Cortland County, on March 12, 1997. The action was removed to the United States District Court for the Northern District of New York on the basis of complete diversity.

The file and record in this case are replete with examples of discovery abuse by plaintiff. GM has sought to inspect the flex fan assembly for more than a year. On May 12, 1998, after application by GM, Magistrate Judge Hurd found that plaintiff failed to comply with the pretrial scheduling order (in part to supply the flex fan assembly for inspection), failed to respond in opposition, and failed to participate in a telephone conference with the court. He consequently granted GM permission [*5] to move before this court for dismissal under either *Federal Rule of Civil Procedure 37* or *56. See* Order of May 12, 1998, docket no. 14. GM then promptly moved for the same.

In opposition to the motion, plaintiff's counsel Diane Bruns filed an affidavit with this court averring that "the fan blades and housing are available for defendant's inspection, should the court [deny GM's motion and] grant plaintiffs' cross-motion to reopen and extend the discovery period." Bruns Aff. of June 17, 1998 at P8, docket no. 22. Plaintiff's statement of material facts in opposition to this first motion stated that "the fan belt [sic] assembly, which was in the custody of plaintiffs' expert witness and in storage during his absence, and the housing are now available for defendant's inspection." Pl.'s Statement of Material Facts of June 17, 1998 at P6, docket no. 24. Finally, plaintiff's memorandum in opposition argued that the action should not be dismissed for discovery abuse because "plaintiffs . . . have provided . . . access to the fan blade assembly now that it has become possible to do so." [6]

---

had ruled out the flex fan's failure due to the bent arm. See Wehe Dep. at 81-82. He was unable to explain, however, what basis he had for ruling out the same. See id. GM argues that because its expert has not examined the flex fan assembly, including the bent arm, he is unable to effectively refute Wehe.

[6] The reason plaintiff then claimed inability to comply with the discovery orders was an extended trip by Wehe. See Bruns Aff. of June 17, 1998 at P3. Wehe apparently had the flex fan assembly in storage during his trip. As GM then correctly pointed out, however, "there is no indication . . . that any attempt was made [by plaintiff's counsel] to contact Dr. Wehe

Pl.'s Mem. of Law of June 17, 1998 at 5, docket no. 25. On August 18, 1998, this court denied [*6] GM's motion and granted plaintiff's cross-motion to reopen and extend the discovery period because counsel represented that plaintiff was now willing to comply with discovery orders and turn over the flex fan assembly.

Following the court's denial of GM's first motion, plaintiff continuously failed to turn over the flex fan assembly, despite counsel's representations that she would do so. Consequently, on September 14, 1998, GM moved by order to show cause to compel discovery. Judge Hurd granted the order to show cause. See Order to Show Cause [*7] of September 17, 1998, docket no. 35. GM then withdrew the motion to compel when it appeared plaintiff would finally turn over the flex fan assembly. See Coon Letter to Judge Hurd of September 23, 1998, docket no. 37. Plaintiff's cooperation, however, proved short-lived. GM again moved for orders to show cause and compel before Judge Hurd on October 7, 1998. Judge Hurd granted the order to show cause on the same date. See Order to Show Cause of October 7, 1998, docket no. 39. In opposition to the motion to compel, plaintiff's counsel admitted that "defendant's counsel is correct in stating that the complete fan assembly has not yet been provided to defendant's expert." Rather, she stated that Wehe "has moved twice and placed many of his records and files in storage." Thus, although some fan blades had been sent to GM, Wehe had yet to locate the remainder of the fan assembly. See Bruns Aff. of October 7, 1998 at P3-4, docket no. 40.

On October 26, 1998, Judge Hurd granted the motion to compel, and specifically ordered plaintiff to turn over the flex fan assembly for inspection. ("Plaintiffs shall produce the complete engine cooling fan to the attorneys for the defendant [*8] on or before November 6, 1998. Failure to produce shall entitle defendant to make a dispositive motion or preclusion motion to the District Judge."). Order of October 26, 1998, docket no. 42. GM then moved for leave to file a summary judgment motion on the merits of the case on November 3, 1998. On the same day, this court denied the motion without prejudice to renew. Moreover, it stated that "the parties are hereby ORDERED to comply in all respects with the aforementioned order of Magistrate Judge Hurd." Order of November 3, 1998, docket no. 44. Plaintiff, as of present, has yet to turn over the flex fan assembly. Pursuant to this court's Order of November 3,

---

during the period of his alleged 'unavailability[.]'" GM Reply of June 30, 1998 at 2, docket no. 27.

jennifer painter

1999 U.S. Dist. LEXIS 12285, *8

1998, and Judge Hurd's Order of October 26, 1998, GM filed the present motion to dismiss, or alternatively moves for summary judgment. In opposition to this present motion, plaintiff finally admits that the remainder of the flex fan assembly has been lost, and can not be found. See Bruns Aff. of February 1, 1999 at P 4, docket no. 55.

After motion papers were filed, the United States Court of Appeals for the Second Circuit decided the case of *West v. Goodyear Tire and Rubber Co., 167 F.3d 776 (2d Cir. 1999),* **[\*9]** which pertained to spoliation of evidence and the propriety of dismissal as a sanction pursuant to *Federal Rule of Civil Procedure 37.* The court then directed the parties to file supplemental briefs discussing this new case and *Rule 37,* as each related to dismissal for spoliation of evidence.

Oral argument was held in Syracuse, New York on March 24, 1999. There, the court questioned plaintiff's counsel to determine what fault, if any, plaintiff bore for the loss of the flex fan assembly. While the court reserved decision on the motions for dismissal or summary judgment, it did make a finding of fact that counsel and Wehe had been, at minimum, negligent in failing to preserve the crucial evidence.

Aside from arguments as to spoliation of evidence, plaintiff also raised a new theory of liability. [7] Defendant argued that plaintiff should not be permitted to assert a new claim so late in case and only in response to summary judgment.

 **[\*10]** The court noted that discovery and motions were closed, and that it would not allow plaintiff to amend the complaint. The court did, however, instruct plaintiff to file a statement setting forth his new claim, with any references in the record supporting its existence, within seven days. Thereafter, defendant was ordered to file its opposition within ten days. Finally, the court ordered plaintiff to file a reply within an additional ten days. [8]

_____

[7]

> "Although the 1984 Chevrolet pick-up was designed with a [safer] clutch fan as original equipment, it was also designed in such a way that the clutch fan could be readily and easily replaced with the more dangerous flex fan, resulting in the hazardous combination of a flex fan with an insufficiently protective plastic shroud, and no warnings concerning the hazards."

Pl.'s Statement of Design Defect at 2, docket no. 66.

[8] Plaintiff filed his statement of the new theory and defendant

For the reasons that follow, GM's motion to dismiss under *Rule 37* is granted. Alternatively, the court grants summary judgment for defendant.

**DISCUSSION**

**I. Dismissal**

GM argues that this matter should be dismissed as a sanction for spoliation of evidence. *HN1*[↑] Spoliation of evidence, as recently defined by the Second Circuit, consists of "the destruction or significant alteration of evidence,  **[\*11]** or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West, 167 F.3d at 779* (citation omitted). A federal court may impose sanctions upon a party who engages in spoliation in derogation of court order. See *Fed. R. Civ. P. 37(b)(2); West, 167 F.3d at 779; John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988).* Even in the absence of a discovery order, the court "may impose sanctions for spoliation, exercising its inherent power to control litigation." *West, 167 F.3d at 779;* accord *Chambers v. NASCO, Inc., 501 U.S. 32, 43-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991); Sassower v. Field, 973 F.2d 75, 80-81 (2d Cir. 1992),* cert. denied, *507 U.S. 1043, 113 S. Ct. 1879, 123 L. Ed. 2d 497 (1993).*

*HN2*[↑] Sanctions for spoliation, including dismissal, are reviewed by the Circuit for abuse of discretion. See *West, 167 F.3d at 779* (citing *Complaint of Consolidation Coal Co., 123 F.3d 126, 131 (3d Cir. 1997),* cert. denied, *523 U.S. 1054, 118 S. Ct. 1380, 140 L. Ed. 2d 526 (1998)); [\*12] Sieck v. Russo, 869 F.2d 131, 134 (2d Cir. 1989).* The Circuit "will reject the district court's factual findings in support of its imposition of sanctions only if they are clearly erroneous." *West, 167 F.3d at 779* (citing *Friends of Animals, Inc. v. United States Surgical Corp., 131 F.3d 332, 334 (2d Cir. 1997)* (per curiam)).

*HN3*[↑] The district court possesses "broad discretion in crafting a proper sanction for spoliation" but such sanction is to "serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Id. This sanction is fashioned to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk;

_____

responded in opposition. Plaintiff, however, then failed to file a reply as directed by the court.

1999 U.S. Dist. LEXIS 12285, *12

and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" Id. (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)).

"HN4[↑] 'Outright dismissal of a lawsuit . . . is within the court's discretion.'" Id. (quoting Chambers, 501 U.S. at 45); see also Fed. R. Civ. P. 37(b)(2)(C). Dismissal [*13] is proper if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned party." West, 167 F.3d at 779 (citing Jones v. NFTA, 836 F.2d 731, 734 (2d Cir. 1987)). Contrary to plaintiff's arguments, dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is any fault of the sanctioned party. See Bobal v. Rensselaer Polytechnic Institute, 916 F.2d 759, 764 (2d Cir. 1990). Plaintiff argues that "the court should consider less drastic measures[.]… where there is no evidence of bad faith causing the loss of the evidence, because two of the most important rationales underlying Rule 37 sanctions are to punish an offending party, and to deter others from acting similarly." Pl.'s Supplemental Brief at 5 (emphasis supplied). Yet, it has been noted that negligent wrongs, like intentional wrongs, are proper subjects for general deterrence. See Penthouse Int'l, Ltd. v. Playboy Enters., Inc., 663 F.2d 371, 387 (2d Cir. 1981) (citing G. Calabresi, The Cost of Accidents, 133-173 (1970)). Not only have negligent [*14] wrongs been found proper subjects for deterrence, but federal courts have dismissed under Rule 37 as punishment for negligence. See Thiele v. Oddy's Auto and Marine Inc., 906 F. Supp. 158, 162-63 (W.D.N.Y. 1995) (evidence negligently lost by plaintiff necessitated dismissal under Fed. R. Civ. P. 37); Brancaccio v. Mitsubishi Motors Co., Inc., 1992 U.S. Dist. LEXIS 11022, 1992 WL 189937, at *2 (S.D.N.Y. 1992) (plaintiff's negligent loss of the defective product, after her expert had examined it, but where defendant had not, necessitated dismissal under Rule 37). 9 Hence, even under plaintiff's own

interpretation of the purposes of Rule 37, quoted above, it is quite clear that courts regard the type of spoliation undertaken by plaintiff as cause for dismissal.

 [*15] Plaintiff should be held responsible for both his expert's loss of the crucial evidence, and his counsel's defiance of court orders. This is the type of fault required for dismissal under Rule 37; although there has been no allegation that Wehe intentionally discarded the flex fan assembly, as an expert retained to examine the actual defective part, he was grossly negligent in permanently altering, and then even worse, losing the very item this lawsuit is over. "Gross professional incompetence no less than deliberate tactical intransigence may be responsible for the interminable delays and costs that plague modern complex lawsuits." Penthouse, 663 F.2d at 387.

Aside from Wehe's loss of the crucial evidence, counsel bears fault for disobeying several orders of both Magistrate Judge Hurd and this court in failing to provide the flex fan assembly, and wasting the scant judicial resources of the court in assuring plaintiff's compliance with mandatory discovery. Until this present motion, counsel never notified the court of her inability to comply with the court's orders, instead engaging in a pattern of delay and avoidance, perhaps waiting for Wehe to return from his [*16] trip, and then hoping Wehe would rediscover the missing evidence. HN5[↑] The district court possesses the discretion to dismiss for disobedience of discovery orders. See Sieck, 869 F.2d at 134 (we . . . prefer to . . . provide the teeth to enforce discovery orders by leaving it to the district court to determine which sanction from among the available range is appropriate.").

Counsel not only bears fault for disobeying court orders, but responsibility for carefully supervising the expert retained. The fact that plaintiff or counsel themselves

---

9 New York State courts also dismiss for negligent spoliation. See Squitieri v. City of New York, 248 A.D.2d 201, 202-03, 669 N.Y.S.2d 589, 590 (1st Dep't 1998) ("Spoliation sanctions such as [dismissal] are not limited to cases where the evidence was destroyed willfully or in bad faith, since a party's negligent loss of evidence can be just as fatal to the other party's ability to present a defense[.]" [citation omitted]); Kirkland v. New York City Housing Auth., 236 A.D.2d 170, 174-75, 666 N.Y.S.2d 609 (1st Dep't 1997) (noting that numerous federal and state courts "have found dismissal warranted when discovery orders were not violated, and even

when the evidence was destroyed prior to the action being filed . . . notwithstanding that the destruction was not malicious . . . or in bad faith[.]" [citations omitted]); Mudge, Rose, Guthrie, Alexander & Ferdon v. Penguin Air Conditioning Corp., 221 A.D.2d 243, 243, 633 N.Y.S.2d 493 (1st Dep't 1995) ("Dismissal of the amended complaint is also warranted because of plaintiff's negligent loss of a key piece of evidence which defendants never had an opportunity to examine[.]" [citation omitted]) (emphasis supplied). While this federal court is bound to vindicate the Federal Rules of Civil Procedure, it surely would be an anomaly if plaintiff was permitted to negligently spoliate evidence and have his case survive in a federal diversity action, but have his claim dismissed if the action was in state court.

1999 U.S. Dist. LEXIS 12285, *16

did not personally lose the evidence is irrelevant. With full knowledge of the pretrial discovery order, and deadlines to turn over evidence, including the flex fan assembly, counsel continued to retain Wehe despite his trip, and let him keep the very items required to be turned over, which were inaccessible while he was on his trip (and ultimately lost). Even after Wehe returned, despite numerous representations to the court that the complete flex fan assembly would be turned over to defendant, it never was.

Finally, plaintiff sometimes must suffer for the faults of his lawyers and experts, especially when their acts are extremely **[*17]** prejudicial to the opposing party, who otherwise has no effective remedy. See _Link v. Wabash R.R. Co., 370 U.S. 626, 633-34, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)_ (client freely selected attorney and is bound by acts of lawyer-agent); see also James Wm. Moore, _Moore's Federal Practice § 37.50[2][b]_, at 37-83, and 37-83 n. 42.2 ("the Supreme Court has rejected the notion that dismissal of a plaintiff's complaint because of counsel's unexcused conduct imposes unjust penalty on the client.").

_HN6_[⬆] Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions. See _West, 167 F.3d at 779_. [10] The Second Circuit has also directed, however, that in fashioning a sanction, the district court must take into account the ability of the sanction to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Id. As GM's defense revolves around pre-accident damage to the very item missing, it will be unable to effectively show that the fan blade broke for reasons other than a defect. A lesser sanction is thus inappropriate **[*18]** as it does not cure the prejudice to GM. [11]

## A. Distinction Between _West_ and the Present Case

Plaintiff argues that this case is similar to _West_, and

consequently should not be dismissed. In _West_, the district court dismissed pursuant to _Rule 37_ after plaintiff spoliated certain evidence which prejudiced defendants. See _West v. Goodyear Tire and Rubber Co., 1998 U.S. Dist. LEXIS 1529, 1998 WL 60942 (S.D.N.Y. 1998)_. The Second Circuit reversed, _167 F.3d 776_, holding that other, less severe **[*19]** sanctions than dismissal should have been utilized. _West_ is clearly distinguishable.

The _West_ plaintiff was injured when a tire he was mounting exploded. Plaintiff had already mounted an identical tire (the "exemplar wheel") which had not exploded. Defendants' theory of defense was that plaintiff grossly overinflated both tires, and the second tire exploded. They planned to show the overinflation by introducing evidence of the overinflated but unexploded exemplar wheel. The exemplar wheel, however, was sent by plaintiff to a lawyer specializing in tire explosion cases. Fearing the tire would explode, that lawyer ordered it deflated. As the Circuit noted, "defendants believe that by deflating the exemplar wheel, West's lawyers deflated their case." _West, 167 F.3d at 780_.

Furthermore, defendants planned to introduce the tire mounting machine and air compressor as circumstantial evidence that the exploded tire was overinflated. As the Circuit itself observed, "the compressor was set at an astronomical pressure of 160 pounds per square inch." _Id. at 778_. Though defendants requested inspection of the compressor and tire mounting machine, and an **[*20]** inspection was scheduled, plaintiff sold the devices before inspection occurred. See id. The devices were later located, but by then had been left outside and their conditions had deteriorated. See id. While defendants' experts were able to examine the devices, and opined that the devices could have malfunctioned and caused overinflation, "because West sold these items and the purchaser left them outside over the winter, defendant's experts had no way to determine the condition of the machines when they were in West's shop at the time of the accident." _Id. at 780_.

Based upon the spoliation of the exemplar wheel, compressor and tire mounting machine, the district court held defendants had been severely prejudiced, and dismissed the case pursuant to _Rule 37_. Reversing, the Circuit held that other less drastic sanctions were available to the district court which would have eliminated the prejudice to defendants without disposing of the case, such as evidence preclusion and inference charges. See _West, 167 F.3d at 780_.

The present matter is entirely different. Most

---

[10] Another circuit has noted that the district court should not be required "to incant a litany of the available lesser sanctions[.]" _Harmon v. CSX Transp., Inc., 110 F.3d 364, 368 (6th Cir. 1997)_.

[11] Alternatively, if lesser sanctions were imposed, such as evidence preclusion, there is a strong possibility of summary judgment in GM's favor due to plaintiff's inability to make out a prima facie case without evidence of the flex fan or pertinent portions of his expert's testimony.

importantly, the missing or spoliated item, unlike in West, is not circumstantial **[*21]** evidence, but the actual part that failed. There can be no adequate lesser sanctions, as they would be tantamount to summary judgment against plaintiff. Cf. *Pesce v. General Motors Corp., 939 F. Supp. 160, 165 (N.D.N.Y. 1996)* (Hurd, M.J.) ("the drastic sanction of preclusion [as to the missing defective item] would be tantamount to dismissal of the action."). Although in a defective design case lesser sanctions may not always prevent the claim, both federal and New York State courts have dismissed defective design cases as a result of plaintiff's spoliation, even where the spoliation occurred negligently. [12]

 **[*22]** Even if the court did impose lesser sanctions, they would not likely remedy the wrong GM has suffered. Not only does GM argue that the flex fan was damaged, precipitating its failure, but GM sought inspection of the flex fan assembly to develop other defenses. As GM never examined the complete flex fan assembly, it does not even know what sanctions it wants the court to impose because it will never know of other defenses an inspection may have revealed. See GM Supplemental Brief at 6-7, 10-11.

In West, the Circuit Court also observed that the exemplar wheel was allegedly deflated as a purported public safety measure, which was a mitigating factor in the spoliation. There are no mitigating factors in the present matter. Plaintiff's expert lost the crucial evidence in this case. There is no excuse for such conduct, nor has plaintiff attempted to argue such. Furthermore, plaintiff's counsel has utterly failed to explain any efforts on her part to mitigate her failure to comply with the court's orders.

Another notable distinction between West and the present case is the type of remedy defendants sought as a sanction for spoliation. In West, only one of two

---

[12] A defective design claim arguably does not require evidence of the product which actually failed, since all of the same type of product are uniformly defective. However, courts have dismissed for spoliation, even where plaintiff alleged a design defect. See *Brancaccio, 1992 WL 189937*, at *2 (case dismissed for spoliation under *Rule 37* where claim of improper seat belt design was present, when seat belt --and vehicle-- were disposed of through plaintiff's negligence); *Squitieri v. City of New York, 248 A.D.2d 201, 202, 669 N.Y.S.2d 589, 590* (1st Dep't 1998) (dismissal of third party complaint alleging defective design for loss of the defective product).

defendants **[*23]** moved to dismiss. The other defendant moved only for lesser sanctions. This made clear that alternatives were available other than dismissal. [13] The circumstances here are different: GM, the sole defendant, moves for dismissal and argues that no other sanction will remove the prejudice plaintiff's spoliation has caused. The court agrees.

Finally, as a last distinction, the district court in West relied only on plaintiff's spoliation for dismissal. In this matter, **[*24]** the court relies not only upon the spoliation, but counsel's noncompliance with orders of both a Magistrate Judge and a District Judge. Not only does this court have the discretion under *Rule 37* to order dismissal for a plaintiff's noncompliance, see *Fed. R. Civ. P. 37*, but as the Supreme Court has recognized, the district court has the inherent power to regulate and control litigation before it. See *Chambers, 501 U.S. at 43-45*. If parties were allowed to disregard mandatory discovery deadlines and orders of the court, orderly and timely adjudication of cases would be subverted.

In summary, West can be distinguished, and the result will not be followed here for several reasons: (1) the evidence spoliated is not circumstantial; (2) due to the nature of the spoliated evidence, effective lesser sanctions may well be tantamount to summary judgment; (3) lesser sanctions may not remedy GM's prejudice because it does not know exactly what a physical inspection of the flex fan would have revealed as a potential defense; (4) no mitigating factors to the spoliation are present; (5) defendant herein actually moves for dismissal and argues only dismissal will protect **[*25]** its interests adequately; (6) plaintiff's counsel's disregard of discovery and other orders of the court support dismissal as a sanction under *Rule 37* and under the court's inherent power to control litigation before it.

Having carefully examined and considered the alternatives, no other remedy than dismissal appears appropriate. Only dismissal serves the three prongs the West panel enumerated as to the purposes of *Rule 37*

---

[13] As the Circuit stated, "it is noteworthy that Goodyear did not move for dismissal as a sanction for spoliation; it only sought to have evidence relating to the spoliated materials excluded at trial. Only [the second defendant] moved to dismiss the complaint on the ground of spoliation. *Obviously, Goodyear believed that lesser sanctions, like exclusion of spoliated evidence, would protect its interests, although Goodyear would now benefit from the district court's dismissal.*" *West, 167 F.3d at 780 n. 1* (emphasis supplied).

and spoliation. [14] First, it will serve as a deterrent to plaintiff's counsel, his expert and non-parties from engaging in spoliation and disobedience of court orders. Second, the risk of an erroneous judgment will be on the party to lose the critical evidence. Third, it appears no other sanction will restore GM to the position it would have been in absent the spoliation.

 [*26]    Accordingly, GM's motion for dismissal is granted. Moreover, as set forth below, the court alternatively grants GM's summary judgment motion.

## II. Summary Judgment

Even if the court did not impose lesser sanctions (which it would if it were not dismissing the case) plaintiff's claims fail as a matter of New York law. [15]

Plaintiff's defective design claims are barred by the subsequent modification doctrine of *Robinson v. Reed-Prentice Div. of Package Mach. Co., 49 N.Y.2d 471, 475, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980)*. As the New York Court of Appeals recently reiterated, "*HN7*[⬆]a manufacturer is not responsible for injuries [*27] resulting from substantial alterations or modifications of a product by a third party that render the product defective or otherwise unsafe." *Liriano v. Hobart Corp., 92 N.Y.2d 232, 236, 677 N.Y.S.2d 764, 765, 700 N.E.2d 303 (1998)* (citing Robinson).

This present matter is analogous to a recent Appellate Division, Third Department case upholding the subsequent modification doctrine under similar facts. See *Colonial Indem. Ins. Co. v. NYNEX, 260 A.D.2d 833, 688 N.Y.S.2d 744, 1999 WL 216867*, *2 (3d Dep't 1999). There, the Appellate Division granted summary judgment to defendant manufacturer because the undisputed cause of the damages was a part added by

a third party subsequent to the product's manufacture. See id. at *1-2.

In the case at bar, as in Colonial Indemnity, plaintiff seeks to hold the manufacturer, GM, liable for the failure of a part which was added to the truck by a third party subsequent to the truck's manufacture and sale. Despite GM's assertion that New York law mandates summary judgment on these claims, plaintiff fails to oppose this argument in his opposition papers. [16] The court [*28] agrees that the subsequent modification doctrine of Robinson requires the claims to be dismissed. Moreover, plaintiff's failure to oppose GM's argument is deemed by the court as consent to summary judgment on these claims.

 [*29]    Plaintiff also alleges a failure to warn claim in his complaint, and reiterated the same at oral argument. Plaintiff otherwise fails to mention or support his allegation of failure to warn. In its motion for summary judgment, GM argues that "there is no record evidence to establish that a warning would have prevented this action, to whom a warning should have been given, the content of the warning, and all the other elements necessary to prove this type of claim." Def. Mem. of Law at 18 n. 7, docket no. 48. Plaintiff never responded to or refuted this argument in his opposition papers. After the court ordered supplemental briefing at oral argument,

---

[14] "(1) Deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West, 167 F.3d at 779* (internal quotations and citation omitted).

[15] In a diversity action, the court must apply the substantive law of New York. See *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)*; *Caiazzo v. Volkswagenwerk A.G., 647 F.2d 241, 243 (2d Cir. 1981)*; *Paul Revere Life Ins. Co. v. Adelman, 1997 U.S. Dist. LEXIS 19804, 1997 WL 773706 (N.D.N.Y. 1997)* (Munson, S.J.).

---

[16] Plaintiff's sole opposition to summary judgment on his defective design claims is the assertion of the "new" theory of liability, mainly that the truck was defectively designed when it left GM's hands, as it was designed to allow the less safe flex fan to be installed. It is too late for plaintiff to assert this new theory, especially when his purpose is plainly to avoid summary judgment due to the subsequent modification doctrine. To determine whether the claim was indeed new, or had been present all along, as maintained by plaintiff, the court directed plaintiff to file a statement describing this new theory, supplemented with references to the record supporting its previous existence. Contrary to his assertions, none of the citations plaintiff points to disclosed or set forth this new theory. As discovery and motions are closed, the court declines to permit the new liability theory on either defective design or failure to warn.

Notwithstanding the untimeliness of plaintiff's new theory, the court notes and adopts GM's argument that plaintiff's novel theory still has, "at its heart, the issue of whether the flex fan was defective and at the root of that issue lies the question of the cause of the failure; a question that GM cannot adequately defend due to plaintiffs' negligent loss of the fan." Def. Reply at 4 n. 2, docket no. 59. Accordingly, even if the court allowed plaintiff's new theory, it does not alter the court's conclusion that this case must be dismissed for spoliation.

GM again argued the failure to warn claim was unviable. "Plaintiff[] here can point to no evidence or expert opinion in the record that the 1984 truck was defective because it lacked appropriate warnings. In contrast, the record shows that GM did provide information about the proper cooling fan to use on this truck." Def. Response at 8 n. 4, docket no. 67. Despite the court's order at oral argument for plaintiff to reply to GM's Response, plaintiff again not only failed to address GM's argument, but failed to file the reply at all. Thus, **[*30]** plaintiff has never opposed GM's argument for summary judgment on this claim.

This court has dismissed failure to warn claims when plaintiff fails to support the claim at a summary judgment motion. See *June v. Lift-A-Loft Equip., Inc., 1992 U.S. Dist. LEXIS 10064, 1992 WL 168181*, *2-3 (N.D.N.Y. 1992) (McCurn, C.J.). As with the present case, the June plaintiff left the "record[] devoid of any factual basis for concluding that the [product] carried inadequate warnings" and the court therefore granted summary judgment to defendant. Id. at *3. The same result is required here.

*HN8*[↑] Additionally, Local Rule 7.1(b)(3) states that "failure to file or serve any papers as required by this rule shall be deemed by the court as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y. L.R. 7.1(b)(3). Plaintiff fails to oppose summary judgment on the warning claim although GM specifically argues it is entitled to such. Not only does plaintiff fail to address GM's argument in his opposition papers, but he failed to file a reply addressing similar arguments after the court directed him to file the same. The court considers plaintiff's failures to oppose **[*31]** as consent to GM's motion for summary judgment on the failure to warn claim.

**CONCLUSION**

For the aforementioned reasons, GM's motion to dismiss pursuant to *Fed. R. Civ. P. 37* is GRANTED. Dismissal is granted (a) due to plaintiff's spoliation of the crucial evidence under *Rule 37*; (b) due to counsel's noncompliance with orders of the court, pursuant to *Rule 37*; and (c) under the inherent authority of the court to control litigation before it. Alternatively, defendant's motion for summary judgment is GRANTED in the entirety.

IT IS SO ORDERED.

Dated: May 17, 1999

Syracuse, New York

Neal P. McCurn

Senior United States District Judge

**JUDGMENT IN A CIVIL CASE** - FILED MAY 18 1999

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: GM's motion to dismiss is GRANTED. Defendant's motion for summary judgment is GRANTED in the entirety.

May 18, 1999

**DATE**

End of Document